DAVID W. ANDERS, Plaintiff-Appellant, v. MOBIL CHEMICAL COMPANY, Defendant-Appellee.

Fourth District   No. 4—89—1001

Opinion filed August 30, 1990.

Stanley N. Wasser, of Feldman & Wasser, of Springfield, for appellant.

James W. Gladden, Jr., of Mayer, Brown & Platt, of Chicago, for appellee.

JUSTICE LUND delivered the opinion of the court:

Plaintiff David W. Anders brought this action in the circuit court of Morgan County, alleging that defendant Mobil Chemical Company discharged him from its employ in violation of an employee handbook. Plaintiff claimed that the handbook distributed by the defendant created enforceable contractual rights. The trial court entered summary judgment in favor of defendant, reasoning that the disclaimer set forth in defendant's handbook clearly indicates the defendant's intention not to create an employment contract. Plaintiff appeals from and we affirm the trial court's order.

Plaintiff advances three arguments for reversal of the trial court's order of summary judgment. Plaintiff first contends that there is a genuine issue of fact as to the character of the employment relationship between plaintiff and defendant. Plaintiff next asserts that the disclaimer set forth in the handbook should have been disregarded by the trial court as a matter of public policy. Finally, plaintiff argues that the trial court erred in finding that the disclaimer did not constitute an anticipatory repudiation of an employment contract.

On January 1, 1979, plaintiff was hired to work at defendant's Jacksonville, Illinois, plant. The Jacksonville plant, which is part of the plastics division of Mobil Chemical Company, produces polyethylene products such as grocery and garbage bags. At the time of plaintiff's termination, he was a senior operator in the grocery sack department and was responsible for the operation of a machine which manufactures plastic grocery bags. While the machine was in operation, plaintiff sat at a desk approximately 3½ to 4 feet away from the machine. There, plaintiff observed the machine's operation and conducted hourly quality checks. Plaintiff admits that he used his desk in the performance of his duties, but contends that it was not part of his work area.

In 1984, plaintiff was issued an employee handbook. Plaintiff states that he has read "everything that was in it." A disclaimer, which appears at the front of the handbook, immediately following

the table of contents states:

"This handbook is meant to show the policies and procedures currently employed by the Plastics Division of Mobil Chemical Company ('Mobil') and are subject to change by Mobil unilaterally and at any time. Mobil does not intend that this handbook, whether provided to an employee before commencement of employment or after commencement of employment, constitute part of any offer of employment or be interpreted expressly or by implication to constitute a contract for employment or to evidence the existence of a contract of employment between Mobil and any employee."

Pages 69 through 71 of the handbook contain employee "Standards of Conduct." Heading the list of specific acts of misconduct is the following statement explaining the disciplinary process:

"Generally a five-step procedure will be used in taking corrective action so that individuals will have an opportunity to correct their behavior. However, a number of acts of misconduct are so universally recognized as being serious violations of accepted behavior that the commission of these acts may subject a person to immediate discharge."

Listed as a specific act of misconduct is "[b]reach of company or departmental safety or smoking rules."

The handbook also explains the nature and purpose of each step in the five-step disciplinary procedure. Steps one and two, "instruction and re-instruction," serve to "provide the employee with training and re-training in order that he or she may correct unsatisfactory performance or behavior." These steps "may or may not be committed to writing, depending on the nature of the offense." Step three, the written warning, "[s]erves to firmly call the employee's attention to continued unsatisfactory behavior or rule violations." Step four, the final warning, "[s]erves to discipline an employee for continued and/or serious violations of rules or continued unacceptable behavior." This step, which may be accompanied by a suspension without pay, puts the employee "on notice that a [recurrence] may be cause for more severe disciplinary action including discharge." Step five, discharge of an employee, "[r]eflects the employee's continued failure to adhere to Rules of Employee Conduct or to correct unsatisfactory performance despite prior corrective discipline; or reflects a serious infraction of the Rules of Employee Conduct which warrants immediate dismissal." The handbook sets forth detailed procedures for approval and review of disciplinary actions by plant management. Additionally, the handbook specifies that an employee will be inter-

viewed and "given the opportunity to appeal to a higher level of management" prior to final discharge.

During the course of his employment, plaintiff and his co-workers reviewed plant and departmental safety rules every six months. Plaintiff read and reviewed the rules in effect at the time of his discharge and told his foreman he had no questions regarding their interpretation. Plaintiff also attended compulsory monthly safety meetings in which safety issues were discussed.

The introduction to the plant safety rules explains that rules set forth in boldface type, "WHEN NOT FOLLOWED, WILL RESULT IN STEP 3 CORRECTIVE ACTION BEING TAKEN AND ARE INDICATIVE OF THE TYPE RULE WHICH WOULD CAUSE MORE SERIOUS CORRECTION ACTION." Plant safety rule No. 19 reads as follows:

> "Utility (bonny) knives are to be used by authorized personnel only. **NEVER USE UNAUTHORIZED OR UNAPPROVED KNIVES (INCLUDES ALL PERSONAL KNIVES). NEVER INAPPROPRIATELY USE AN APPROVED KNIFE.**" (Boldface in original.)

Departmental safety rule No. 12 for the grocery sack department provides:

> "Scissors will be used whenever possible to cut film. Before scissors are used, make certain the points of the scissors have been ground off. A utility knife may be used only when scissors or a hook knife will not perform the job safe[l]y. When utility knives are carried, they will be in a proper sheath. Only approved utility knife blades with blunt ends will be used. Personal knives will never be used."

The events leading to plaintiff's discharge began on February 12, 1987, when plaintiff cut his hand while cleaning the printing press section of the grocery sack machine. Plaintiff's supervisor issued a "step two" disciplinary write-up, stating that plaintiff performed "an unsafe act by placing his hand in such a manner that it slipped off and went into the press."

On March 4, 1987, plaintiff's supervisor issued a "step three" written warning based upon plaintiff's improper use of a utility knife to cut banding from cartons on a pallet. Plaintiff was told that his next safety-rule violation would lead to a final warning.

On April 5, 1987, plaintiff received a "step four" final warning and a three-day suspension without pay after he was observed cleaning ink off a print cylinder while the production line was running. Plaintiff met with his immediate supervisor, the production supervi-

sor, and the plant's operations manager to discuss the violation. Plaintiff was advised that he was on final warning, and any further violation of the safety rules would result in termination.

On January 21, 1988, plaintiff's supervisor observed plaintiff sitting at his desk in the production area cutting grooves in a wooden ink-stirring paddle with his pocketknife. Plaintiff admits that this activity had no relationship to his job duties. Plaintiff's supervisor informed him that he was violating a safety rule which prohibited the use of personal knives. Plaintiff contended that he was not violating any safety rule because he "was not working on anything and was s[i]tting at [his] desk." Following an argument about the plaintiff's interpretation of the safety rule, plaintiff was suspended until further notice. Plaintiff's supervisor then prepared and signed an incident report in which he recommended plaintiff's termination. The report was reviewed and signed by the production supervisor, the employee relations advisor, the employee relations manager, the operations manager, and the plant manager. Approximately three days later, plaintiff attended a meeting with his supervisor, the production supervisor, and the employee relations advisor. There, he was informed of the decision to terminate him. At no time did plaintiff request an appeal to a higher level of management.

Plaintiff subsequently filed a complaint for wrongful discharge, alleging that the handbook issued by defendant constitutes an employment contract which defendant breached by discharging plaintiff. Defendant filed a motion for summary judgment, contending that the employee handbook did not create an employment contract and, even if it did, defendant complied with all procedural steps described therein. The trial court granted defendant's motion, stating that the disclaimer set forth in defendant's handbook is not disfavored by public policy and clearly indicates defendant's intention not to create enforceable contractual rights. Plaintiff now appeals, contending that the trial court erred in granting summary judgment.

■ Section 2—1005(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c)) provides that a party may be granted summary judgment "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling upon such a motion, the trial court must consider the pleadings and evidentiary matters in the record in the light most favorable to the nonmoving party and accept as true the reasonable inferences from such facts which favor the nonmovant. *National Bank v. City of Lexington*

(1985), 138 Ill. App. 3d 805, 808, 486 N.E.2d 967, 969.

Plaintiff first contends that the trial court could not determine on the basis of the pleadings and depositions whether plaintiff was an at-will employee or was employed pursuant to a contract, the terms of which were set forth in the employee handbook. We disagree.

■■ ■ An employment relationship without a fixed duration is terminable "at will" by either party for any or no cause. (*Duldulao v. Saint Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482, 489, 505 N.E.2d 314, 317; *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 128, 421 N.E.2d 876, 878.) However, the "employment-at-will rule" mandates only a presumption that a hiring without a fixed term is at will. This presumption can be overcome by demonstrating that the parties contracted otherwise. (*Duldulao*, 115 Ill. 2d at 489, 505 N.E.2d at 318.) In *Duldulao*, our supreme court established a test for determining whether an employee handbook constitutes a contract of employment:

"[A]n employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present. First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed." *Duldulao*, 115 Ill. 2d at 490, 505 N.E.2d at 318.

■ Application of the above principles to this case reveals that the first element of contract formation is not present. Defendant's handbook contains a clear disclaimer stating that the policies and procedures described therein are "subject to change by Mobil unilaterally and at any time." The disclaimer further provides that the handbook is not intended to "constitute part of any offer of employment or be interpreted expressly or by implication to constitute a contract for employment or to evidence the existence of a contract of employment between Mobil and any employee." This explicit disclaimer compels our conclusion that the handbook does not, in the words of the *Duldulao* court, "contain a promise clear enough that

an employee would reasonably believe that an offer has been made." (*Duldulao*, 115 Ill. 2d at 490, 505 N.E.2d at 318.) In fact, the disclaimer makes it quite clear that the defendant is promising nothing.

Plaintiff provides a distinction between *Duldulao* and this case, noting that although *Duldulao* establishes that employee handbooks can create enforceable contract rights, the case does not posit any rule regarding the consequence of disclaiming language. While it is true that the handbook at issue in *Duldulao* contained no disclaimer, the test for contract formation set forth in that case is equally applicable here. Support for this conclusion can be found in the opinions of several appellate courts which have analyzed employee handbooks or policy statements containing disclaimers and have held that such handbooks or statements cannot be construed as offers to enter an employment contract. (*Hogge v. Champion Laboratories, Inc.* (1989), 190 Ill. App. 3d 620, 546 N.E.2d 1025; *Bennett v. Evanston Hospital* (1989), 184 Ill. App. 3d 1030, 540 N.E.2d 979; *Moore v. Illinois Bell Telephone Co.* (1987), 155 Ill. App. 3d 781, 508 N.E.2d 519, *appeal denied* (1987), 116 Ill. 2d 562, 515 N.E.2d 112.) Of the foregoing cases, *Bennett* is most similar to this case.

In *Bennett*, the plaintiff brought an action to recover damages for breach of an employment contract, alleging that the employee handbook issued by the defendant constituted such a contract. Much like the handbook issued by the defendant in this case, the Evanston Hospital Employee Handbook contained no provision which required just cause as a basis for dismissal. Additionally, an introduction from the hospital's president on the first page of the handbook stated that the handbook *"is not intended to create a contract of employment."* (Emphasis in original.) (*Bennett*, 184 Ill. App. 3d at 1031, 540 N.E.2d at 980.) In affirming the trial court's dismissal of plaintiff's complaint, the First District Appellate Court cited *Duldulao* and held that "the court correctly found no contract could exist." (*Bennett*, 184 Ill. App. 3d at 1033, 540 N.E.2d at 981.) Given its factual similarity to this case, *Bennett* provides strong support for our affirmance of the trial court's finding that there is no contract between the plaintiff and the defendant.

Plaintiff contends that this case is unlike *Bennett* and is factually similar to *Seehawer v. Magnecraft Electric Co.* (N.D. Ill. 1989), 714 F. Supp. 910. In *Seehawer*, the plaintiff, an executive secretary, was issued an employee manual which provided, in relevant part, that, "[e]mployees shall be discharged or disciplined only for just cause." (*Seehawer*, 714 F. Supp. at 912.) Shortly after defendants issued the manual, plaintiff signed an employee statement, which provided that

"my employment and compensation can be terminated, with or without cause and notice, at any time, at the option of the Company or myself." (*Seehawer*, 714 F. Supp. at 912.) The employee statement further provided that the president and vice-president of Magnecraft had sole authority to enter any agreement to the contrary. (*Seehawer*, 714 F. Supp. at 912.) Plaintiff was terminated and subsequently brought an action advancing several theories of recovery, including breach of contract. Defendants moved for summary judgment on plaintiff's breach of contract claim. The trial court denied defendants' motion for summary judgment, reasoning that the apparent inconsistency between the manual's "just cause" provision and the employee statement's disclaimer of any contractual relationship precluded summary judgment for two reasons. First, the court noted that the seemingly conflicting provisions could be reconciled in the plaintiff's favor:

> "In addition to the disclaimer, the Statement provides that the president and vice-president have sole authority to bind Magnecraft to a promise to terminate only for cause. It is not unreasonable to view the Manual as an exercise of that authority, thus requiring Magnecraft to justify its termination decisions." (*Seehawer*, 714 F. Supp. at 914-15.)

The *Seehawer* court then cited a second rationale for its denial of summary judgment, stating, "[T]o the extent that the provisions are irreconcilable on their face, the clarification of ambiguities in contractual provisions is a matter best left to the trier of fact." *Seehawer*, 714 F. Supp. at 915.

■ The considerations which counseled against summary judgment in *Seehawer* are not present in this case. The disclaimer set forth at the front of defendant's employee handbook and the procedures and policies contained in the handbook are neither inconsistent nor conflicting. Although the handbook sets forth rules and standards of conduct and outlines a five-step disciplinary procedure, it contains no express "just cause" provision as the manual at issue in *Seehawer* did. Taken as a whole, the handbook spells out policies and procedures which are generally followed by the defendant corporation, but states clearly at the outset that the defendant is in no way legally bound to follow them simply because it put them in writing. There are no ambiguities or inconsistencies for the trier of fact to clarify. Summary judgment was properly entered on the basis of the pleadings and depositions.

Plaintiff next argues that the trial court should have disregarded the disclaimer as a matter of public policy. As authority for this prop-

osition, plaintiff cites numerous cases in which courts have restricted the effect of exculpatory clauses limiting the buyer's right to damages in contracts for the sale of goods. (See, *e.g., Berwind Corp. v. Litton Industries, Inc.* (7th Cir. 1976), 532 F.2d 1; *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.* (1980), 86 Ill. App. 3d 980, 408 N.E.2d 403.) Plaintiff contends that these cases demonstrate that "[d]isclaiming language, such as the language used in defendant's handbook is not favored as a matter of public policy and should be disregarded as unconscionable in the employment context." The analogy plaintiff attempts to draw between these cases and the case at bar is unpersuasive.

*Berwind* and *Frank's Maintenance,* as well as the other cases plaintiff cites, address sellers' attempts to limit their obligations under *existing* contracts for the sale of goods. At issue in this case is whether a contract between plaintiff and defendant exists. *Frank's Maintenance* illustrates the inapplicability of this line of cases. In *Frank's Maintenance,* the court set forth two ways in which a clause attempting to limit or exclude consequential damages may be unconscionable. The court stated that unconscionability "can be either procedural or substantive or a combination of both." (*Frank's Maintenance,* 86 Ill. App. 3d at 989, 408 N.E.2d at 409-10.) The court explained that "[p]rocedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice" while "[s]ubstantive unconscionability concerns the question whether the terms themselves are commercially reasonable." (*Frank's Maintenance,* 86 Ill. App. 3d at 989-90, 408 N.E.2d at 410.) As we previously stated, the trial court correctly determined that the defendant's employee handbook could not be construed as an offer conferring the power of acceptance upon the plaintiff. Therefore, there was neither a formation process nor a single contractual term for the court to examine. Neither we nor the trial court could address the potential unconscionability of a disclaimer set forth in a nonexistent contract. *Berwind, Frank's Maintenance,* and the other cases plaintiff cites offer no guidance in deciding this case.

Plaintiff further argues that "[t]he prime underpinning of the law's disfavor of disclaimers is that the law takes cognizance of the unequal bargaining position of the parties." Plaintiff concludes that "the unequal bargaining position[s] of Plaintiff and Defendant are glaring." However, there is nothing in the record to suggest that plaintiff had little choice but to work for Mobil Chemical.

■ Plaintiff also notes that "a further consideration that the law takes cognizance of is whether the operation of a disclaimer results

in an unconscionable result." The "result" created by the disclaimer in defendant's employee handbook is an at-will employment relationship. It is difficult to conceive how the at-will employment relationship between plaintiff and defendant, which would have been legally presumed if the defendant had issued no handbook, is somehow an "unconscionable result." We do not view at-will employment relationships as inherently unfair.

In sum, there is no authority supporting plaintiff's contention that clauses disclaiming the existence of an employment contract are legally disfavored. In the absence of such authority, we decline to adopt plaintiff's reasoning. It seems illogical to conclude that an employer violates public policy by asserting the existence of an at-will employment relationship when, as in this case, such a relationship is legally presumed. An additional consideration counseling against a finding that employment contract disclaimers violate public policy is the likely result of such a holding. Without the ability to disclaim the existence of an employment contract, employers would be hesitant to publish any rules or procedures, fearing that such statements would be construed as contractual terms. Consequently, employees would have little knowledge of their employer's expectations. It seems a better public policy not to discourage employers from publishing general rules and expectations. Published policies, as opposed to spoken policies or no articulation of policy at all, provide a greater degree of clarity and certainty to at-will employment relationships and foster a better working environment.

Finally, plaintiff contends that the disclaimer set forth at the front of the employee handbook stands as an anticipatory repudiation of the contractual terms which comprise the remainder of the hand-book. Plaintiff reasons that "in issuing the handbook Defendant set forth terms and conditions of employment creating a contractual relationship with Plaintiff but Defendant at the same time, by the inclusion of the disclaiming language, indicated in advance that it had no intention of living up to its obligations under the handbook contract terms." Plaintiff's reasoning is somewhat tortured.

██ ██ Anticipatory repudiation occurs when a party bound by an executory contract gives notice of his intention not to comply with his obligations. When such notice is given, the other contracting party may accept such notice as an anticipatory breach and treat the contract as ended without waiting for the completion of its terms. (*Stonecipher v. Pillatsch* (1975), 30 Ill. App. 3d 140, 142, 332 N.E.2d 151, 153.) To apply the doctrine of anticipatory repudiation in this case, we would have to conclude that defendant's employee handbook

simultaneously created an employment contract by its terms and then breached that contract by its disclaimer. We know of no case where a single document has been found to both create and breach a contract, and we see no reason to reach such a result in this case. The trial court provided a more logical interpretation of the defendant's employee handbook when it concluded, as do we, that its disclaimer clearly indicates the defendant's intention not to create enforceable contractual rights. For this and all the foregoing reasons, the trial court properly entered summary judgment in favor of the defendant.

Affirmed.

KNECHT, P.J., and GREEN, J., concur.