James **RYAN,** Plaintiff and Appellant,

v.

**DAN'S FOOD STORES, INC.,** a Utah corporation, **Ted D. Gardiner,** and **Debra Hall** aka **Debra Scott,** Defendants and Appellees.

No. 970213.

Supreme Court of Utah.

Aug. 18, 1998.

---

Leonard E. McGee, Salt Lake City, and Bruce W. Shand, Heber City, for plaintiff.

John S. Chindlund, Thomas J. Erbin, Salt Lake City, for Dan's Food Stores, Inc.

ZIMMERMAN, Justice:

James Ryan asks this court to overturn a trial court's grant of summary judgment in favor of his former employer, Dan's Foods, Inc. ("Dan's"). Ryan argues that summary judgment is improper because a material issue of fact exists as to whether Dan's terminated him in breach of an express or implied employment contract or in violation of public policy. We affirm.

We first turn to a review of the facts. Because this is an appeal from a grant of summary judgment, "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993). We recite the facts accordingly.

Ryan began employment with Dan's as a part-time pharmacist in 1992. In September of 1993, Ryan met with Ted D. Gardiner, president of Dan's, to interview for a full-time pharmacy position. During this meeting, Ryan told Gardiner that his previous employer, Harmon's, had fired him from one of its pharmacies; Ryan also told Gardiner that he believed Harmon's fired him because he reported that another Harmon's employee was taking narcotics from the pharmacy. In response, Gardiner stated, "I've got no problem with that.... I'll never reprimand a pharmacist for following the law.... That's one thing I demand of all my pharmacists that work for me, that they do everything by the book." Following this meeting, Gardiner made Ryan a full-time pharmacist at Dan's Sandy, Utah, store.

On September 7, 1993, a manager at Dan's gave Ryan a copy of Dan's employee handbook. The manager told Ryan that he needed to read the handbook and return a signed acknowledgment form before he could receive his paycheck. Ryan read the handbook and signed and returned the acknowledgment form. In reviewing the handbook, Ryan had concerns about its statement: "Your employment at Dan's is at will and may be terminated without cause or prior notice by either you or Dan's." He spoke to his supervisor, Melissa Hong, about his concerns. Although he told her he could not believe that that was Dan's policy, he also acknowledged that he understood it.

During the eighteen months that Ryan worked full-time for Dan's, many customers complained about Ryan's treatment of them: the store director, Ray Carter, received at least 30 customer complaints about Ryan, and Ryan's direct supervisor, Melissa Hong, received at least two complaints every month. Most of the customers who complained said that Ryan was rude to them or treated them poorly. When Ryan worked part-time for Dan's, Scott Buchanan, head pharmacist overseeing all Dan's pharmacies, received dozens of reports from pharmacy

managers relaying customers' complaints about Ryan.

Dan's management repeatedly counseled and warned Ryan about these complaints and his treatment of customers: Ryan's direct supervisor, the store manager, and Buchanan counseled Ryan on a monthly basis about the customer complaints. Ryan told them he would try to change and promised to do better. On the other hand, Ryan received at least five letters, two from Gardiner and three from area law enforcement officers, complimenting him on his thoroughness in detecting fraudulent prescriptions.

On April 21, 1995, Buchanan asked Gardiner for permission to terminate Ryan because of the numerous customer complaints. Gardiner gave his permission, and on April 26th, Ryan was given notice that Dan's was terminating him for his treatment of customers. At this time, Ryan received and signed an employee separation report, a report in which Dan's explained its reasons for terminating Ryan.

Ryan filed an action in state court on October 23, 1995, alleging that Dan's wrongfully terminated him in violation of public policy. Ryan later amended his complaint, adding a claim for wrongful termination based on a breach of an implied-in-fact contract of employment. Dan's moved for summary judgment on both claims. Pursuant to rule 56(c) of the Utah Rules of Civil Procedure, the trial court granted summary judgment in Dan's favor. The court ruled: (i) Ryan was an at-will employee, and therefore Dan's did not terminate him in violation of any employment contract, and (ii) Dan's did not terminate Ryan in violation of public policy; rather, it terminated him for the way he treated Dan's customers.

On appeal, Ryan argues that the court erred in granting summary judgment. We begin by setting forth the standard of review and then proceed with our analysis. "Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *V–1 Oil Co. v. Utah State Tax Comm'n*, 942 P.2d 906, 910 (Utah 1996). Because "a challenge to summary judgment presents only a question of law,"
we review it for correctness. *West v. Thomson Newspapers*, 872 P.2d 999, 1004 (Utah 1994). In reviewing a grant of summary judgment, "[w]e determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact." *Ferree v. State*, 784 P.2d 149, 151 (Utah 1989).

On the merits, Ryan argues that Dan's breached an express or implied contract of employment and terminated him in violation of public policy. Because both issues involve the at-will employment doctrine, we begin with an overview of that doctrine before proceeding to our analysis.

■ Utah law presumes that an employment arrangement that does not have a specified term of duration is at-will. *See Fox v. MCI Communications Corp.*, 931 P.2d 857, 859 (Utah 1997). An at-will employment arrangement allows either the employer or the employee to terminate the employment for any reason, or no reason at all, at any time; moreover, the employer may "do so without extending any procedural safeguards to an employee, except as required by law." *Id.* However, the at-will presumption is only that—a presumption. *See id.* An employee may overcome that presumption by showing that (i) an express or implied employment agreement existed that prohibited an employer from terminating an employee without cause or without satisfying other agreed-upon conditions; (ii) a statute or regulation restricts the employer's right to terminate; (iii) the termination "constitutes a violation of a clear and substantial public policy." *Id.* (internal footnote omitted). In this case, Ryan attempts to overcome the at-will presumption by arguing that Dan's breached an express or implied contract and that it terminated him in violation of public policy. We address each argument in turn.

■ Ryan first asserts that Gardiner created an express or implied-in-fact employment contract when he told Ryan that Dan's would not reprimand him for following the law. "A wrongful termination case based on a violation of an express or implied term of the employment agreement rests on a duty

that an employer voluntarily undertakes as a consequence of the employment agreement itself, whether express or implied." *Id.* at 860. Although the existence of an implied contract is a factual question, "the court retains the power to decide whether, as a matter of law, a reasonable jury could find that an implied contract exists." *Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 306 (Utah 1992). If we conclude that a reasonable jury could not find an implied contract, we will affirm the summary judgment. *See id.*

We conclude that even if Gardiner's statement that Dan's would not terminate Ryan for following the law created an express or implied contract, as a matter of contract law,[1] Ryan's receipt of the Dan's employee handbook and his signing of the acknowledgment form modified and superseded any previous conditions of that contract. On this point, we adopt the reasoning of the court of appeals in *Trembly v. Mrs. Fields Cookies*, 884 P.2d 1306 (Utah Ct.App.1994). In *Trembly*, an employee claimed that a supervisor's verbal statements created an implied-in-fact employment contract requiring certain disciplinary procedures before termination. *See id.* at 1312. The court of appeals found the supervisor's statements were not controlling because even if those statements were sufficient to operate as a contract provision, the employee received an employee handbook specifying that all employment was at-will, *after* the supervisor made the verbal representations about a progressive discipline policy. *See id.* at 1312–13. The court of appeals stated that "if an employee has knowledge of a distributed handbook that changes a condition of the employee's employment, and the employee remains in the company's employ, the modified conditions become part of the employee's employment contract." *Id.* at 1312.

■ The *Trembly* reasoning comports with our decision in *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997 (Utah 1991). There we stated:

"In the case of unilateral contract for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employment supplies the necessary consideration for the offer."

*Id.* at 1002 (quoting *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 627 (Minn.1983)). In many circumstances, a fact question will exist as to whether the parties intended to modify an at-will employment contract. *See id.* at 1001. However, when an employee admittedly has knowledge of a distributed handbook's provision that modifies the employment contract and continues to work for the employer after gaining such knowledge, the modified contract prevails, and previous, contradictory conditions have no effect.

Applying these principles to the facts of this case, Ryan received an employee handbook after Gardiner made statements representing that Dan's would not discipline employees for following the law. The handbook's first page of text clearly establishes Dan's at-will employment policy. It states:

The rules, policies, procedures and benefits described in this handbook supersede the terms of any previous rules, policies, procedures and benefits.

. This handbook is not intended to create a contract of employment with Dan's, and nothing contained in this handbook should be construed as a contract of employment or guarantee of a job. You are an "at-will" employee. As such, you have the right to quit at any time for any reason or no reason at all. Similarly, Dan's has the right to terminate your employment at any time for any reason or no reason at all, without cause and without prior notice.

1. Here, we only analyze whether Dan's terminated Ryan in violation of an express or implied contract. As we discuss later, Dan's, like all employers, cannot terminate an employee in violation of public policy.

The undisputed facts show that Ryan received this handbook, read it, and understood the at-will nature of his employment. Moreover, Ryan signed a form on September 7, 1993, acknowledging his understanding of the contents of the employee handbook. The acknowledgment form stated: "I have received and read my copy of Dan's Associate Handbook.... I realize that this handbook does not constitute an employment agreement, that employment is for no definite period of time and may be terminated at will." We hold that Ryan's receipt and acknowledgment of the handbook, which notified him of his at-will status, revoked any express or implied contractual conditions contradictory to the handbook, such as a condition altering Ryan's at-will status.

Ryan, however, further urges this court to refuse to give effect to the acknowledgment form on the ground that the form is unconscionable. He argues that the form was unconscionable because he occupied a disparate bargaining position, as evidenced by the fact that (i) he had already been working for Dan's and had accumulated wages when Dan's presented him with the acknowledgment form; (ii) the acknowledgment was a form document that everyone had to sign; and (iii) Dan's required Ryan to sign the form before it would give him a paycheck for wages already earned.

A party claiming unconscionability bears a heavy burden. *See Resource Management Co. v. Weston Ranch,* 706 P.2d 1028, 1041 (Utah 1985). The law enables parties to freely contract, establishing terms and allocating risks between them. *See id.* at 1040–41. The law even permits parties to enter into unreasonable contracts or contracts leading to a hardship on one party. *See Bekins Bar V Ranch v. Huth,* 664 P.2d 455, 459 (Utah 1983). However, "this general principle has its limits.... If a contract is unconscionable, in whole or in part, the court may, on equitable grounds, refuse to enforce the unconscionable provisions, or it may construe the contract to avoid an unconscionable result." *Id.* Unconscionability, while defying precise definition, " 'has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " *Resource Management Co.,* 706 P.2d at 1043 (quoting *Williams v. Walker–Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965)).

In determining whether a contract is unconscionable, we use a two-pronged analysis. *See Sosa v. Paulos,* 924 P.2d 357, 360 (Utah 1996). The first prong—substantive unconscionability—focuses on the agreement's contents. The second prong—procedural unconscionability—focuses on the formation of the agreement. *See id.* Our consideration of whether a contract provision is unconscionable is made "in light of the twofold purpose of the doctrine, prevention of oppression and unfair surprise." *Resource Management,* 706 P.2d at 1041. We have acknowledged that substantive unconscionability alone may support a finding of unconscionability but that procedural unconscionability without any substantive imbalance will rarely render a contract unconscionable. *See Sosa,* 924 P.2d at 361. We now apply each prong of the unconscionability test to Ryan's claim.

Substantive unconscionability focuses on "the contents of an agreement, examining the 'relative fairness of the obligations assumed.' " *Id.* (quoting *Resource Management,* 706 P.2d at 1043). In determining substantive unconscionability, we consider whether a contract's terms are "so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an overall imbalance in the obligations and rights imposed by the bargain ... according to the mores and business practices of the time and place." *Id.* (internal quotations and citations omitted). Even if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable—the terms must be "so one-sided as to oppress ... an innocent party." *Id.*

We conclude that the acknowledgment form, which provided that Ryan was an at-will employee, is not substantively unconscionable. The at-will employment arrangement gives employers and employees the same right—the right to terminate the rela-

tionship at any time, for any reason. And while the law places some limits on an employer's ability to terminate an at-will relationship, such as public policy, it does not place similar limitations on employees. Moreover, the fact that Utah law presumes employment to be at-will in the absence of contrary agreement is alone enough to support the conclusion that an at-will term is not substantively unconscionable. *See Anders v. Mobil Chem. Co.*, 201 Ill.App.3d 1088, 147 Ill.Dec. 779, 559 N.E.2d 1119, 1124 (Ill.App. Ct.1990).

■■■■ Turning to the procedural unconscionability prong, we conclude that no procedural unconscionability was present. Procedural unconscionability focuses on the negotiation of the contract and the circumstances of the parties. *Sosa*, 924 P.2d at 362. Our principle inquiry is whether there was overreaching by a contracting party occupying an unfairly superior bargaining position. *Cf. id.; American Food Management, Inc. v. Henson*, 105 Ill.App.3d 141, 61 Ill.Dec. 122, 434 N.E.2d 59, 63 (Ill.App.Ct. 1982). Factors bearing on procedural unconscionability include:

(1) whether each party had a reasonable opportunity to understand the terms and conditions of the agreement; (2) whether there was a lack of opportunity for meaningful negotiation; (3) whether the agreement was printed on a duplicate or boilerplate form drafted solely by the party in the strongest bargaining position; (4) whether the terms of the agreement were explained to the weaker party; (5) whether the aggrieved party had a meaningful choice or instead felt compelled to accept the terms of the agreement; and (6) whether the stronger party employed deceptive practices to obscure key contractual provisions.

*Sosa*, 924 P.2d at 362 (internal citations omitted). None of the factors is dispositive; rather, we consider all the circumstances in light of the doctrine's purpose to prevent oppression and unfair surprise.

■■■■ As to the first and fourth factors, we conclude that Ryan had a reasonable opportunity to understand the terms of the acknowledgment form and accompanying handbook and that Dan's explained the terms to Ryan. Ryan acknowledged that he read the handbook and had questions regarding the at-will clauses after reading it. Specifically, Ryan had concerns about the handbook's statement: "Your employment at Dan's is at will and may be terminated without cause or prior notice by either you or Dan's." He spoke to his supervisor, Melissa Hong, about his concerns. Ryan and Hong discussed the policy, and although Ryan told Hong he could not believe that that was Dan's policy, he also acknowledged that he understood it.

■■■■ Likewise, as to the sixth factor, Dan's did not use deceptive practices to obscure the at-will provision. To the contrary, the acknowledgment form clearly indicates Dan's position regarding its at-will policy, and the handbook reiterates that policy. The handbook's first page states, "You are an 'at-will' employee." On page 19, the handbook reiterates that "your employment at Dan's is 'at-will' and may be terminated without cause or prior notice by either you or Dan's." Dan's did not attempt to hide or obscure the at-will language. Instead, they clearly and openly stated the at-will policy.

■■■■ Under the fifth factor, we conclude that Ryan had a meaningful choice in deciding whether to accept the terms of the agreement. We distinguish Ryan's situation from that in *Sosa*, 924 P.2d at 364, where we invalidated a medical arbitration agreement on unconscionability grounds. In that case, Sosa received an arbitration agreement along with two consent forms less than an hour before she underwent knee surgery. She was already dressed in surgical clothing when someone from her surgeon's office gave her the three documents, one of which was the arbitration form, and asked her to sign them. Neither her surgeon nor any of his staff ever discussed the arbitration agreement with Sosa. At the time she received the forms, Sosa was nervous and anxious and also felt rushed to sign the documents. We concluded that Sosa was in a vulnerable position when she signed the arbitration agreement and found it both procedurally and substantively unconscionable.

In contrast, the undisputed facts of this case show that Dan's gave Ryan an opportunity to review the handbook and ask questions, both of which Ryan did. Ryan concedes that he understood the at-will term. However, Ryan argues that Dan's coerced him into signing the acknowledgment form by refusing to give him his paycheck until he did so. Even if true, this did not eviscerate Ryan's choice whether to accept the terms of the acknowledgment. Ryan could have refused to sign the acknowledgment and thereafter obtained his paycheck.[2] Alternatively, Ryan could have signed the acknowledgment form, received his paycheck, quit Dan's, and sought employment elsewhere, as the at-will term permitted him to do. Although Ryan may have wanted to work at Dan's, he was free to seek employment with another pharmacy that did not maintain at-will employment.

▪ As to the second and third factors, we recognize that the acknowledgment form was printed on a duplicate form drafted solely by Dan's and that Ryan did not have an opportunity to negotiate the at-will term. However, these factors alone do not render the acknowledgment unconscionable. Almost all employment contracts are drafted by the employer. *See Sablosky v. Edward S. Gordon Co.*, 73 N.Y.2d 133, 538 N.Y.S.2d 513, 535 N.E.2d 643, 646 (N.Y.Ct.App.1989). Likewise, standard forms, such as Dan's acknowledgment, are common for employment contracts.

▪ All the factors taken together indicate that the acknowledgment form did not oppress or unfairly surprise Ryan and, therefore, was not procedurally unconscionable. Because the acknowledgment form is not unconscionable, Ryan's receipt of it revoked any express or implied conditions contradictory to the handbook, such as a condition altering Ryan's at-will status.

▪ Although we conclude that Ryan was an at-will employee, we must still determine whether Dan's discharged him in violation of public policy. Ryan claims that Dan's violated a clear and substantial public policy by terminating him for questioning the validity of customers' prescriptions as required and allowed by federal law. Utah law has recognized that a public policy limitation applies to all employment arrangements. *See Fox*, 931 P.2d at 860; *Heslop v. Bank of Utah*, 839 P.2d 828, 836 (Utah 1992); *Peterson v. Browning*, 832 P.2d 1280, 1281 (Utah 1992). That is, all employers have a duty not to terminate any employee, "whether the employee is at-will or protected by an express or implied employment contract," in violation of a clear and substantial public policy. *Retherford v. AT & T Communications*, 844 P.2d 949, 960 (Utah 1992). If an employer breaches that duty, an employee has a tort cause of action against the employer. *See Retherford*, 844 P.2d at 959–60; *see also Fox*, 931 P.2d at 860.

▪ To make out a prima facie case of wrongful discharge[3], an employee must show (i) that his employer terminated him; (ii) that a clear and substantial public policy existed; (iii) that the employee's conduct brought the policy into play;[4] and (iv) that the discharge and the conduct bringing the policy into play are causally connected. *Cf. Heslop*, 839 P.2d at 837; *Wilmot v. Kaiser Alum. & Chem. Corp.*, 118 Wash.2d 46, 821 P.2d 18, 28–29 (1991); Henry H. Perritt, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cinn. L.Rev. 397, 398–99 (1989). As to subpart (iv), the employee initially need show only that the conduct bringing the public policy into play "was *a* cause of the firing."

2. If Dan's had refused to give Ryan his paycheck after he declined to sign the form, Ryan could have taken legal action. *See* Utah Code Ann. §§ 34–28–3, 34–27–1 (allowing employee to recover attorney fees in addition to amount of wages due).

3. We here recast the standard applied in our previous cases to make analytical clarity and procedural regularity more easily achievable by bench and bar. In so doing, we do not change the substantive law regarding discharges in violation of public policy.

4. Another way to characterize the operation of subpart (iii) is to determine whether "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy." Henry H. Perritt, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cinn. L.Rev. 397, 399 (1989).

*See Wilmot,* 821 P.2d at 29. If the employee establishes a prima facie case, the employer must then articulate a legitimate reason for the discharge. *See id.*[5] When faced with evidence of a legitimate reason for termination, the employee must prove that engaging in the protected conduct was a "substantial factor" in the employer's motivation to discharge the employee. *See id.* at 30. We address each element in turn.

■ We can summarily dispose of the first element because it is undisputed that Dan's discharged Ryan. We next address the second factor: whether a clear and substantial public policy existed. We have recognized the importance of keeping the scope of the public policy exception narrow to avoid unreasonably eliminating employer discretion in discharging employees. This court "will narrowly construe the public policies" which might be used to support a public policy claim. *Peterson,* 832 P.2d at 1282. We have stated that "the public policy exception applies in this state when the statutory language expressing the public conscience is clear and when the affected interests of society are substantial." *Id.* We reiterate today that only clear and substantial public policies will support a claim of wrongful discharge in violation of public policy.

A public policy is "clear" only if plainly defined by legislative enactments, constitutional standards, or judicial decisions. *See Hodges v. Gibson Prods. Co.,* 811 P.2d 151, 165–66 (Utah 1991). In an early public policy case, then Associate Chief Justice Howe emphasized:

"The public policy exception is narrow enough in its scope and application to be no threat to employers who operate within the mandates of the law and clearly established public policy as set out in the duly adopted laws. Such employers will never be troubled by the public policy exception because their operations and practices will not violate public policy."

*Peterson,* 832 P.2d at 1285–86 (Howe, A.C.J., concurring) (quoting *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 878 (Mo.Ct.App.1985)).

In addition, to support a public policy claim, it is necessary that the policy further substantial *public,* as opposed to private, interests. *See Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1042–43 (Utah 1989). As this court previously stated:

First, one must ask whether the policy in question is one of overarching importance to the public, as opposed to the parties only. Second, one must inquire whether the public interest is so strong and the policy so clear and weighty that we should place the policy beyond the reach of contract, thereby constituting a bar to discharge that parties cannot modify, even when freely willing and of equal bargaining power.

*Id.* This notion of "public policy" is far narrower than what may typically be characterized as "public policy." *Cf. Black's Law Dictionary* 1231 (6th ed.1990) (defining "public policy" as "[c]ommunity common sense and common conscience" and "general and well-settled public opinion relating to [people's] plain, palpable duty to [others]"). Further, as the California Supreme Court has stated in a case upon which this court has relied,

Even where ... a statutory touchstone has been asserted, we must still inquire whether the discharge is against public policy and affects a duty which inures to the benefit of the public at large rather than to a particular employer or employee. For example, many statutes simply regulate conduct between private individuals, or impose requirements whose fulfillment does not implicate fundamental public policy concerns.

*Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 379 (Cal.1988); *see also Fox,* 931 P.2d at 861–62. Courts may determine whether the policy at issue is "substantial" by "examin[ing] the

---

5. An employer merely carries a burden of production, requiring it only to produce admissible evidence of another reason for termination. *See Wilmot,* 821 P.2d at 29 (holding that "employer must produce relevant admissible evidence of another motivation, but need not do so by the preponderance of evidence necessary to sustain the burden of persuasion," because employer does not have that burden; employee always bears the burden of persuasion).

strength of the policy as well as the extent to which it affects the public as a whole" and by determining whether we would allow an employer and an employee to nullify the policy by express agreement. *Retherford*, 844 P.2d at 966 n. 9.

For example, in *Fox*, we concluded that the employer, MCI, did not violate a substantial public policy when it terminated its employee, Fox, for reporting potential criminal conduct, not substantially affecting the public interest, of other MCI employees to MCI. *See Fox*, 931 P.2d at 861–62. Recognizing that any duty an employee may have to inform his employer of conduct that directly affects the employer's business generally serves primarily the private interests of the employer, we determined that MCI and Fox could have agreed that Fox had no duty to disclose information about the conduct in question. "In sum, even though an employee may have a duty to report information concerning the employer's business to the employer, retaliatory termination for the reporting of possible criminal conduct by coworkers to the employer does not give rise to a violation of the clear and substantial public policy of enforcing the criminal law." *Id.* at 861.

In this case, Ryan argues that he was following a clear and substantial public policy set out by 21 C.F.R. § 1306.04 and 21 U.S.C. § 801. Section 1306.04 provides in pertinent part:

A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and *the person knowingly filling such a purported prescription, as well as the*

*person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.*

21 C.F.R. § 1306.04(a) (emphasis added). Ryan argues that this section "clearly requires him to check on prescriptions that he believes are unusual under the broad definition of 'usual course'" and that "it is the policy of the state of Utah to require licensed pharmacists to check on the validity of prescriptions to determine if those prescriptions are not in the ordinary course of treatment." We disagree.

Section 1306.04 does contain a clear and substantial public policy, but it is a narrow one, one which only prohibits pharmacists from *knowingly* filling an improper prescription. Violation of section 1306.04 "require[s] a wilful violation." *Ohio v. Poleyeff*, 1993 Ohio App. Lexis 2483, *4, 1993 WL 158258, at *1 (Ohio Ct.App.1993). Section 1306.04 does not mandate or even authorize a pharmacist to question every prescription or to conduct an investigation to determine whether an otherwise facially valid prescription has been issued other than in the "usual course" of the doctor's practice. But when faced with a prescription that is irregular on its face—"no date, no physician signature, an obviously toxic dose"—section 1306.04 requires further inquiry. *Kampe v. Howard Stark Prof. Pharmacy, Inc.*, 841 S.W.2d 223, 226 (Mo.Ct.App.1992). However, after inquiring and obtaining the necessary information, a pharmacist cannot use section 1306.04 as a basis to refuse to fill a prescription. Therefore, section 1306.04 does not set forth the public policy Ryan suggests—it does not establish a policy requiring pharmacists to verify prescriptions.

Ryan also alleges that 21 U.S.C. § 801 contains a clear and substantial public policy that required or allowed his conduct. Ryan argues that this section indicates that: "Clearly, the public policy to be protected is the protection of the public from illegal distribution of controlled substances." Ryan misconstrues the clear and substantial public policy contained in section 801.[6]

6. In her concurring opinion, Justice Durham

disagrees with our discussion of section 801 be-

Section 801 introduces the federal Drug Abuse Prevention and Control Act ("DAPCA"). *See* 21 U.S.C. §§ 801 to 966. It provides:

The Congress makes the following findings and declarations:

(1) Many of the drugs included within this title have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.

(2) *The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.*

(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because—

(A) after manufacture, many controlled substances are transported in interstate commerce,

(B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and

(C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.

(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.

(5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.

(6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.

(7) The United States is a party to the Single Convention on Narcotic Drugs, 1961, and other international conventions designed to establish effective control over international and domestic traffic in controlled substances.

21 U.S.C. § 801 (emphasis added).

Section 801 announces a general public policy against the manufacture, importation, and distribution of drugs, some of which have legitimate medical uses if properly prescribed. However, this general policy is not the type of clear and substantial policy that will support Ryan's wrongful discharge claim. Section 801 is merely a prefatory section to DAPCA, which, as a whole, establishes regulations governing controlled substances and outlines criminal penalties for engaging in prohibited acts involving drugs. Congress passed other sections to establish specific legal requirements relating to the manufacture and dispensing of drugs. For example, 21 C.F.R. § 1306.04, relied on by Ryan, was passed under the authority of sections 821, 829, and 871 of title 21 of the United States Code. Having concluded that the specific section relating to pharmacists does not contain a clear and substantial policy prohibiting Dan's from terminating Ryan for generally questioning prescriptions, we easily conclude that section 801's general statement of intent lacks such a policy.

This case is before us as an appeal from summary judgment entered against Ryan. Given the standard of review applicable to summary judgment, we must address Ryan's allegation that Dan's terminated him for questioning prescriptions in violation of 21 C.F.R. § 1306.04 and 21 U.S.C. § 801. Before we can decide whether Dan's did terminate him in violation of section 801, we must determine whether that section contains a clear and substantial public policy.

cause, as she states, "there was simply no evidence Ryan was fired for questioning prescriptions." However, the undisputed facts show that the report written and provided to Ryan upon termination stated that: "On several occasions Jim has questioned regular customers doctors decisions on medication.... He ... has also angered several customers by questioning their prescriptions or telling them we were out of stock to avoid filling the script."

Nonetheless, we have previously recognized that there is a clear and substantial public policy in encouraging the reporting of criminal conduct to the public authorities: "The public policies embedded in the criminal laws have long been deemed of such importance that the law also encourages persons to report criminal activity to public authorities." *Fox*, 931 P.2d at 861. DAPCA is part of the criminal law—it outlines specific criminal violations and penalties related to illegal drugs. Thus, if an individual reported activity criminalized by DAPCA to the public authorities, that individual would be acting in accordance with a clear and substantial public policy.

The foregoing brings us to the third element of the cause of action: whether Ryan's conduct implicated either section 1306.04's prohibition against knowingly filling an improper prescription or the general public policy encouraging citizens to report violations of criminal law. In our previous cases, we have already outlined certain conduct that typically brings into play a clear and substantial public policy: (i) refusing to commit an illegal or wrongful act, such as refusing to violate the antitrust laws, *see Peterson*, 832 P.2d at 1281 (citing *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (Cal.1980)); (ii) performing a public obligation, *see id.*, such as accepting jury duty, *see Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975); (iii) exercising a legal right or privilege, *see Peterson*, 832 P.2d at 1281, such as filing a workers' compensation claim, *see Lally v. Copygraphics*, 85 N.J. 668, 428 A.2d 1317 (1981); or (iv) reporting to a public authority criminal activity of the employer, *see Fox*, 931 P.2d at 861.

As evidenced by our public policy cases, determining what employee conduct implicates or furthers a clear and substantial public policy is a still-developing inquiry.[7] Although we have established certain conduct that will almost always implicate a clear and substantial public policy, such as an employee's refusing to violate the law, there are other situations that we will have to address as they come before us—Ryan's case is one such case.

7. In *Fox v. MCI Communications Corp.*, 931 P.2d 857 (Utah 1997), we held that an employer does not wrongfully discharge an employee where there is no clear and substantial public policy and only internal reporting. In *Fox*, MCI terminated Fox after she repeatedly told MCI management that other MCI employees were "making customer accounts appear new on corporate records so that they could meet sales quotas and earn higher commissions," conduct that, she believed, constituted computer-assisted fraud prohibited by the Utah Code. We concluded that the policy involved in that case was not clear and substantial because it lacked a " 'distinctly "public" interest.' " *Id.* at 862 (quoting *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 380 n. 12 (Cal.1988) (en banc)). Instead, the policy against internally misrepresenting accounts served the private interest of MCI. Thus, *Fox* suggests that internal reporting does not implicate a clear and substantial public policy.

In contrast, we suggested in *Heslop v. Bank of Utah*, 839 P.2d 828 (Utah 1992), that where there is a clear and substantial public policy affected by the employer's conduct, internal reporting alone may support a wrongful discharge claim. *See Heslop*, 839 P.2d at 838. In that case, Heslop knew that the bank for which he worked violated the Utah Financial Institutions Act. Heslop approached various bank officials and its board of directors on numerous occasions to voice his insistence that the bank comply with the Act, but Heslop never informed public authorities of the violations. Eventually, another bank employee did inform federal and state bank regulators of the violations. As a result of this disclosure, the Utah Attorney General began investigating the bank for potential criminal wrongdoing. In connection with this investigation, the Attorney General requested to meet with Heslop to ascertain information about the bank; it was only in complying with this request that Heslop communicated with public officials about the bank's potential criminal activity. Bank management became very angry when they learned that Heslop spoke to the Attorney General. Eventually, the bank discharged Heslop.

In reversing the dismissal of Heslop's public policy claim, we stated:

We do not agree that plaintiff cannot meet a public policy requirement simply because he did not report the violation to the Attorney General or the Commissioner. Plaintiff pursued all internal methods for resolving the problem; he need not have gone outside the bank to try to correct the policy violation. Further, plaintiff presented evidence that he did speak to investigators in the Attorney General's office and that top management of the Bank became very angry when he did so.

*Id.* Although *Heslop* suggests that any internal reporting will support a wrongful discharge claim, we emphasize that only internal reporting that furthers a clear and substantial public policy will satisfy the third element of a wrongful discharge claim.

Ryan alleges that Dan's fired him for questioning prescriptions. However, we cannot determine from Ryan's allegation whether he is arguing that Dan's fired him for questioning prescriptions that section 1306.04 required him to question or for questioning prescriptions outside section 1306.04's narrow duty. Given our discussion of sections 1306.04 and 801, Dan's violated a clear and substantial public policy only if it fired Ryan for questioning prescriptions that section 1306.04 would *require* him to question or for reporting criminal activity to the public authorities. The undisputed facts show that Ryan questioned prescriptions. The facts also show that in some instances Ryan notified authorities of suspected fraudulent prescriptions.[8] Thus, there are three possible types of conduct involved: (i) Ryan's questioning of prescriptions that section 1306.04 did not require him to question, (ii) his questioning of prescriptions that section 1306.04 required him to question, and (iii) his contacting the public authorities of suspected criminal conduct independent of his questioning of prescriptions.

Ryan did not bring a clear and substantial public policy into play by questioning prescriptions falling outside section 1306.04's requirements. Ryan's questioning fulfilled a personal objective, not a public policy objective. However, whenever Ryan questioned prescriptions section 1306.04 required him to question, he furthered a clear and substantial public policy. Moreover, whenever Ryan reported suspected criminal activity to the police, he brought into play a clear and substantial public policy.

Having found that some of Ryan's conduct did bring into play a clear and substantial public policy, we next examine whether he has made out the fourth element of the prima facie case—causation. Under the framework articulated earlier, Ryan must first show by a preponderance of the evidence that the policy-related conduct was *a* cause of his discharge. That is, Ryan must show that either his contacting public authorities or fulfilling section 1306.04's narrow duty was *a* cause of

his termination. If Ryan makes this showing, Dan's must offer a legitimate reason for discharging him. If Dan's can offer a legitimate reason, Ryan must then prove, by a preponderance of the evidence, that his engaging in the policy-related conduct was a *substantial* factor in Dan's motivation to terminate Ryan. We first apply these elements to Ryan's contacting public authorities and then to his questioning prescriptions.

Ryan has not even shown that his contacting the public authorities was *a* cause of his termination. Although the record established that Ryan, in fact, contacted the police, it shows no evidence that his termination had anything to do with his contacting any public authority.

On the other hand, the record does establish that Ryan's questioning of prescriptions as required by section 1306.04 could have been a cause of his termination. The employee separation report Dan's completed indicates Ryan's questioning could have been a cause in Dan's motivation for terminating him. The report stated in part:

On several occasions Jim has questioned regular customers doctors decisions on medication—specifically painkillers (Jim has a genuine concern about prescription drug abuse and on several occasions has caught forged prescriptions.) He, however, has also angered several customers by questioning their prescriptions or telling them we were out of stock to avoid filling the script.

■ Even if Ryan could show that the policy-related conduct was a cause of the termination, Dan's has already articulated a legitimate reason for termination. Dan's has produced relevant and admissible evidence showing that it terminated Ryan because of his history of customer complaints and repeated warnings to him about improving his treatment of customers. Accordingly, Ryan must prove by a preponderance of the evidence that the policy-related conduct was a substantial factor in his termination. Determining whether an employee's engaging in protected conduct was a substantial

8. A letter from a Sandy City detective explains that in one instance Ryan called the prescribing physician to verify a suspicious prescription.

When Ryan learned the prescription was in fact altered, he called the police, who arrested the customer.

factor in motivating an employer to discharge the employee is an inquiry that defies precise definition. However, we need not attempt to articulate today a standard to use in this determination because the facts in this case, as a matter of law, could not support the conclusion that Ryan's engaging in protected conduct was a substantial factor in Dan's deciding to terminate him.

The undisputed facts show that Ryan had a history of customer complaints.[9] Ryan questioned prescriptions throughout his tenure with Dan's. Only after continued complaints about Ryan's treatment of customers did Dan's discharge him. We believe that it is appropriate to consider "the reasonableness of the manner in which the employee reported, or attempted to remedy, the alleged misconduct," *Dicomes v. Washington*, 113 Wash.2d 612, 782 P.2d 1002, 1007 (1989), or to fulfill a legal requirement. Here, the way Ryan treated customers, the way he handled his questioning of customers' prescriptions, and his tactics in refusing to fill prescriptions, i.e., lying to customers, were the reasons Dan's terminated Ryan.

Specifically, the employee separation report cites three instances where Ryan angered customers. In one instance, Ryan questioned a customer's prescription, but in the employee separation report, Ray Carter, Dan's store manager, wrote that he "felt that Jim had *no reason* to question the script." Ryan has failed to dispute the fact that he had no reason to question the customer's prescription. The employee separation report also states that Ryan told a customer that Dan's was out of a particular medication when in fact it was not and told another customer that Dan's policy prohibited veterinarians from phoning in prescriptions when Dan's policy in fact allows this. In sum, as a matter of law, Ryan cannot show by a pre-

ponderance of the evidence that his questioning prescriptions as required by section 1306.04 was a substantial factor in Dan's motivation to terminate him.

In conclusion, we uphold the trial court's ruling that Ryan was not covered by an express or implied employment contract. We also conclude that the acknowledgment form was not unconscionable. Finally, we agree with the trial court that Dan's did not terminate Ryan in violation of public policy.

HOWE, C.J., and RUSSON, J., concur in Justice ZIMMERMAN's opinion.

STEWART, J., concurs in the result.

DURHAM, Associate Chief Justice, concurring in the result:

I join the majority opinion and its result as to the issues of Ryan's at-will status and of unconscionability. Most of the majority's analysis of the public policy question, however, I deem unnecessary and beyond the scope of the questions raised by these facts. The undisputed facts show that Ryan was terminated for rudeness and poor treatment of customers, not for his efforts to verify prescriptions or communications with law enforcement. The majority opinion expends considerable analysis, however, to conclude that the U.S. Code "does not contain a clear and substantial policy prohibiting Dan's from terminating Ryan for generally questioning prescriptions." The analysis and the conclusion are superfluous, since there was simply no evidence Ryan was fired for questioning prescriptions, or for reporting suspected criminal conduct, a conclusion the majority opinion itself finally reaches ("Ryan has not even shown that his contacting the public authorities was *a* cause of his termination,"; "the facts in this case, as a matter of law,

---

**9.** Dan's articulated its reasons for terminating Ryan in the employee separation report. The report states in pertinent part:

Over the last year and nine months—Jim has had several incidents with customers—some customers complained simply that he was ornery, gruff, or even rude to them. We attempted (Scott Buchanan, Ray Carter, Melissa Hong) several times to help Jim with this problem. He tried to improve but continued to have problems with this from time to time.

Some of our customers quit shopping with us specifically because of Jim's "attitude."

On several occasions Jim has questioned regular customers doctors decisions on medication—specifically painkillers (Jim has a genuine concern about prescription drug abuse and on several occasions has caught forged prescriptions.) He, however, has also angered several customers by questioning their prescriptions or telling them we were out of stock to avoid filling the script.

could not support the conclusion that Ryan's engaging in protected conduct was a substantial factor in Dan's deciding to terminate him"). In light of those facts, I deem it unnecessary and probably unwise to engage in extensive analysis about the public policy question. I do, however, concur in the result.