LUVERNE HARDEN, Plaintiff-Appellee and Cross-Appellant, v. PLAYBOY ENTERPRISES, INC., Defendant-Appellant and Cross-Appellee.

First District (1st Division)    No. 1—92—1508

Opinion filed November 15, 1993.—Rehearing denied May 24, 1994.

Lonny Ben Ogus and Carol M. Walsh, both of Chicago, for appellant.

Burton Joseph and Joel T. Daly, both of Barsy, Joseph & Lichtenstein, of Chicago, for appellee.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Plaintiff, Luverne Harden, filed an action at law for wrongful discharge alleging that her employer, Playboy Enterprises, Inc., breached its employment contract with her in violation of the employment manual when it failed to follow procedures relating to discharge. The trial court ruled that defendant's employment handbook created an enforceable contractual relationship between Playboy and the plaintiff. The matter then went to trial and the jury found in favor of plaintiff. The trial court modified the jury award and entered judgment thereon. Both parties have appealed.

The issues raised on appeal are: (1) whether the trial court erred by ruling that as a matter of law Playboy's employment handbook constitutes an enforceable contract; (2) whether the trial court committed evidentiary errors with regard to tenders of evidence and objections thereto; (3) whether the trial court properly instructed the jury; (4) whether the judgment is against the manifest weight of the evidence; and (5) whether the trial court properly reduced the judgment by the amount received by plaintiff as unemployment compensation.

Plaintiff began working in May 1973 in the corporate offices of Playboy as a secretary and grants assistant at a salary of $600 per month ($7,200 per year). The evidence reveals that during her employment plaintiff was a satisfactory employee, received promotions, an award, and was never suspended or reprimanded. Prior to 1983, she received two raises, one in July of 1981 and the second in July of 1982 of 13% and 6%, respectively.

The record also indicates that on December 21, 1978, plaintiff received the Playboy handbook, signed for it and read it. The handbook sets forth various personnel policies, among which are included policies regarding discipline and discharge.

In 1983 the board of directors of Playboy caused the present president to resign because of serious financial losses the company was experiencing. The new president, Christie Hefner, was directed to and did engage in a program of restructuring the company which included closing and selling businesses and cutting costs.

At that time, plaintiff worked in the foundation department, which was consolidated with the public affairs department into a new public affairs department. As a result of the reorganization, the employees in the newly organized department were assigned additional duties. According to plaintiff's testimony, she first learned of the proposed change in her duties on May 2, 1983, during an interview with her immediate supervisor, Rebecca Sive-Tomashevsky. Because plaintiff was displeased with the proposed additional duties and was concerned that the proposed volume of work would cause her to fail, she asked to speak directly with Ms. Hefner. During that interview, on May 5, 1983, plaintiff allegedly indicated that she could not and would not perform the additional duties.

Plaintiff later met with Russell A. Ringl, the director of corporate personnel, on May 19, 1983, at which time she again expressed her concern that the increased workload would cause her to fail in the new job and that she believed it was unreasonable that she was being asked to do what she considered to be two people's jobs. By this time, plaintiff had received a written statement containing her new job description. Ringl testified that he discussed the reasons for the changes and consolidation of functions and informed plaintiff that unless she at least tried to perform the work she would be terminated. He stated after he read to plaintiff the portion of the handbook discussing refusal or intentional failure to perform work, the plaintiff then responded, "Well, you'll have to do what you'll have to do." Ringl testified that he told the plaintiff to think about the matter overnight and inform Ms. Sive-Tomashevsky the next day whether or not she was accepting the position effective May 23.

Later on the same day, plaintiff delivered a note to Ms. Sive-Tomashevsky which reads as follows:

> "5/19/83 I don't understand this job description. As I told you when we met, I have absolutely no plans for doing any of the clerk responsibilities. It's peculiar that you were able to determine, before the work surfaced, that you would need a professional to help you, but cannot see that the two jobs are too much for me. I will not do it. Luverne"

However, on the following day, May 20, 1983, plaintiff delivered a memorandum to Mr. Ringl advising him that she had completed an application for promotion to the new public affairs position which had just been "posted." Additionally, she reiterated that she still believed that "the clerk's job and my present job [*sic*] is more of a load than I can carry, and that it is cruel and unreasonable to ever ask that of anyone." However, the memo continued as follows:

"[T]here is the belief that I can't make that determination from the length of time I've tried it. *** Even though you said that this has not been discussed, I'd like to propose this: that I give it my best to perform these additional duties for the next month, with everybody having an opportunity to evaluate, and at this time if things are not as they should [*sic*], you will arrange for a part-time or temporary to help. If it does, all's well."

The record also reveals that Ms. Sive-Tomashevsky memorialized her conversation, of May 20, 1983, with plaintiff, reiterating that she needed an answer from plaintiff by 2 p.m. as to whether she would accept the job responsibilities. The letter also stated that she was unprepared to discuss the new public affairs position with plaintiff at that time since the position had just been posted and the two jobs were separate issues. Ringl also memorialized his conversations of May 19, 1983, with plaintiff and Ms. Sive-Tomashevsky.

According to the record, Ms. Sive-Tomashevsky noticed plaintiff in the office at about 1:45 p.m., but plaintiff failed to appear for their scheduled 2 p.m meeting. At 2:08 p.m., Ms. Sive-Tomashevsky called Mr. Ringl advising him that plaintiff failed to appear for the meeting and at 2:11 p.m. she notified plaintiff of her termination. However, the plaintiff met with Ms. Sive-Tomashevsky at 2:23 p.m. and allegedly said, "this was not the last [*sic*] would hear of this." During the last encounter, plaintiff did not mention whether she was interested in continuing her employment or whether she was willing to begin working under the new job description.

Plaintiff's version of the events that transpired on May 20, 1983, is slightly different. She testified that she was scheduled to meet with Ms. Sive-Tomashevsky at 2 p.m. However, after returning from lunch she went to Ms. Sive-Tomashevsky's desk at 2 p.m., but finding her on the phone, left to get a cup of coffee. Plaintiff returned between 2:08 p.m. and 2:12 p.m. at which time Ms. Sive-Tomashevsky immediately terminated her. Plaintiff stated that prior to termination she never refused to do any work and was never accused of being insubordinate.

Playboy executives testified that the handbook outlines certain company policies. Mr. Ringl stated that plaintiff was terminated

under the "gross misconduct" section of the handbook for insubordination and, thus, in her case the Step III/IV procedure leading to termination was unnecessary. He stated that plaintiff was terminated because of her refusal to accept assigned work at the reasonable request of management.

Following trial which was conducted on February 5 and 6, 1992, the jury returned a verdict in favor of plaintiff awarding her the sum of $62,000. Judgment was entered on the verdict. Both parties filed post-trial motions, and on April 14, 1992, after reducing the verdict by the sum of $6,160 by reason of unemployment compensation received by the plaintiff, the court entered a revised final judgment of $55,840. Plaintiff stipulated at the hearing on the motion that she had received $6,160 in unemployment compensation benefits. Both parties appealed. Notice of appeal was timely filed by Playboy on May 1, 1992, and notice of cross-appeal was timely filed by plaintiff on May 7, 1992.

Playboy first contends that the trial court erred when it ruled as a matter of law that Playboy's manual or employment handbook is a contract. Playboy asserts that it made no categorical assertions that the handbook procedure would be followed as did the employer in the case of *Duldulao v. Saint Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482, 505 N.E.2d 314. Instead, it maintains that the Playboy handbook is similar to the manuals or handbooks in other cases, *i.e.*, *Harrell v. Montgomery Ward & Co.* (1989), 189 Ill. App. 3d 516, 545 N.E.2d 373, and *Tolbert v. St. Francis Extended Care Center* (1989), 189 Ill. App. 3d 503, 545 N.E.2d 384, merely a discretionary policy manual not containing "clear promises" which would have justified plaintiff in believing she had a firm offer. It urges that the court should have determined, as a matter of law, that the manual in this case did not constitute an enforceable contract between the parties.

Playboy also argues that even if the handbook constitutes a contract, it was in substantial compliance with the procedures by discharging plaintiff in the manner in which it did. Playboy asserts that it was entitled to discharge plaintiff without going through the Step III/IV procedure which the handbook outlines for disciplinary matters because her refusal to comply with superiors' instructions constituted acts of insubordination for which an employee could be immediately terminated.

We believe the trial court properly found the handbook creates enforceable contractual rights between the plaintiff and Playboy. Our reasons follow.

■ Generally, employment relationships of indefinite duration are presumed terminable "at will" by either party without cause

unless facts support the existence of a contract. (*Duldulao*, 115 Ill. 2d at 489.) Whether a contract exists is a question of law to be determined by the court. (*Habighurst v. Edlong Corp.* (1991), 209 Ill. App. 3d 426, 568 N.E.2d 226.) *Duldulao* is the principal case in Illinois concerning whether and to what extent an employment handbook creates enforceable rights. In that case, the Illinois Supreme Court enunciated a three-prong test for determining whether an employee handbook creates enforceable rights:

"[A]n employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present. First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed." *Duldulao*, 115 Ill. 2d at 490.

*Toombs v. City of Champaign* (1993), 245 Ill. App. 3d 580, 615 N.E.2d 50.

We have reviewed the facts and circumstances of the instant case in light of the *Duldulao* factors. First, Playboy admitted the handbook was prepared and distributed so that its employees would know their rights and duties. The handbook contained no language of disclaimer. To the contrary, we believe the statements in the employee handbook contained a clear promise of offer. The Playboy handbook unequivocally states:

"A. This Handbook has been prepared for you because you're very important to Playboy, not only as an employee, but also as a person with your own wants and needs. Your individual contribution and the team spirit with which you perform your work are the fundamentals of success—both yours and Playboy's.

In exchange for your services, Playboy will serve your personal needs for growth, job satisfaction and financial security. We do this by providing a stimulating work environment, competitive salary and benefits such as Life Insurance, Profit Sharing, Medical and Dental Insurance, vacations and holidays—just to name a few.

This handbook is designed to be a permanent record for the information that is important to you throughout your career with Playboy. As policies change or new ones are adopted, you will

receive revised pages to be inserted in your handbook. If you have questions, your supervisor will be happy to provide you with the information you need, or refer you to the appropriate person in the Personnel Department.

We are pleased to have you as a member of the Playboy organization and look forward to a continued and mutually rewarding association."

Second, the handbook was disseminated to employees who not only were required to sign an acknowledgment for its receipt but who also were encouraged to read the handbook. Section one, entitled "Your Company," states, in pertinent part: "The manual is the property of Playboy Enterprises, Inc. and is for your use during your employment. We suggest that you read through the handbook \*\*\* so that you can become familiar with its contents, and then keep it handy for future reference."

Third, after receiving the handbook in 1978, plaintiff continued to work for Playboy. Accordingly, based on the present factual matrix, we believe the trial court correctly determined the Playboy handbook established a contractual agreement.

Further, we find the cases relied on by Playboy to be distinguishable from the present case. In *Harrell* (189 Ill. App. 3d 516, 545 N.E.2d 373), the definition of discharge existed solely as a guideline for classifying separation in order to determine an employee's benefits and eligibility to be rehired as evidenced by a code number. The employer's handbook there allowed termination when conduct was "determined to be detrimental to the best interests of the Company." The reasons given for disciplinary measures were used in conjunction with a guideline for classification of separation benefits and eligibility to be rehired. *Harrell*'s policy made no mention of specific termination definitions or procedures. Here, Playboy set forth very specific reasons for terminations without using them for any other purpose.

Similarly, in *Tolbert* (189 Ill. App. 3d 503, 545 N.E.2d 384), the handbook there provided no specific procedures to be followed in the event of discipline or dismissal whereas Playboy's handbook contains those provisions and is significantly specific. Neither do we find *Ganz v. Zagel* (1989), 193 Ill. App. 3d 1051, 550 N.E.2d 1007, or *Boulay v. Impell Corp.* (7th Cir. 1991), 939 F.2d 480 to be on point. In *Ganz*, the handbook did not set forth procedural steps to be followed, did not give the definition of "cause," and left discretion with the supervisor. Further, in *Boulay*, the manual contained a disclaimer stating: "[n]othing in this policy shall be construed as a guarantee of employment or a promise of continued employment." (939 F.2d at

481.) However, Playboy's handbook, like that in *Duldulao*, contains no disclaimer. Nor was there a promise of a grievance procedure in *Boulay*, as in the present case.

■ Neither do we agree with Playboy's contention that it substantially complied with the termination provisions in the handbook. We believe the statements in the handbook contain a clear promise such that an employee would reasonably believe that a progressive disciplinary procedure is required prior to discharge. The handbook provides in the section entitled "Corrective Action Policy" (Personnel Policy #202-1), in part, as follows:

"Step I—Informal Counseling

A verbal discussion between the manager and the employee about the problem.

Step II—Second Notice

A written formal statement to the employee from his/her supervisor about the problem and the action to be taken to correct the problem.

Step III—Suspension

If the problem is essentially unacceptable behavior (including excessive absenteeism or tardiness) and is not corrected following Step II, the employee may be suspended without pay for a defined period of time.

Step IV—Termination

This final step may be taken if an employee's level of work performance continues to fall below acceptable levels (following Step II) or if behavior problems continue (following Step III)."

Playboy maintains it discharged plaintiff for cause without regard to Steps III and IV because her behavior constituted gross misconduct based on insubordination. The section it relies on provides, in pertinent part: "[o]f course, an employee may be discharged for cause without regard to this III/IV step procedure for gross misconduct. Gross misconduct is a single incident of a very serious nature, including but not limited to: Insubordination, including refusal or intentional failure to follow any reasonable request given by an employee's supervisor or by an appropriate member of management." The alleged act of insubordination here was plaintiff's failure to agree to take on more job duties pursuant to Playboy's reorganization and her failure to meet her supervisor at the scheduled 2 p.m. meeting on May 20.

Plaintiff's version, as previously noted, however, reveals that she did intend to accept the job. Her memo dated May 20, 1983, states her proposal to "give it my best to perform these duties for the next month." Additionally, she testified that she did attend the scheduled meeting in a timely fashion and that she did not refuse assigned

work or reasonable requests by her superiors. Conflicting evidence as to whether plaintiff's conduct constituted gross misconduct, as to whether she attended the meeting, and as to whether the facts, including the memoranda, exhibited a willingness on her part to do the work or an outright refusal are matters better left to the trier of fact. The jury also was charged with determining whether plaintiff's conduct justified Playboy's actions of bypassing its own Step III/IV procedure for suspension and termination for cause.

The jury determined that plaintiff's actions did not constitute cause for immediate termination on the basis of insubordination amounting to gross conduct. It also ostensibly found that Playboy had no just cause to terminate plaintiff without following its own procedure. As the handbook's own policies contained no provisions allowing them discretion to otherwise terminate plaintiff, none existed. The jury heard the evidence and was in the best position to review the facts and determine whether plaintiff's conduct constituted gross misconduct within the meaning of the handbook. Having reviewed the record, we believe the jury could have reasonably concluded that the facts here involved a disagreement between the parties and that plaintiff's arrival a few minutes late for a meeting did not amount to "cause," "misconduct," or "insubordination." We further believe the record supports the jury's finding that Playboy breached the contract by skipping the procedures for terminating an employee as set forth in the handbook.

■ Playboy's second contention on appeal is that the trial court erred by refusing its tender of evidence offered to show that a successor to plaintiff was not only easily able to handle the additional duties imposed upon the holder of the position at that time, but was able to handle even greater duties imposed at a later time. Matters to be allowed into evidence are matters within the discretion of the trial court and absent an abuse of that discretion the reviewing court will not reverse such determinations. We find no abuse of discretion by the trial court here. (*Cole v. Guy* (1989), 183 Ill. App. 3d 768, 539 N.E.2d 436.) Plaintiff's own testimony revealed that she was ready, willing and able to work. Moreover, the tender of evidence offered by Playboy, if admitted, would not have materially affected the result of the case. See *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 476 N.E.2d 1232.

■ Playboy's third contention is that the trial court's view on damages resulted in erroneous instructions to the jury. It maintains error in that the trial court gave one isolated and general instruction to the jury telling it only that a contract is to be construed against the party who drafted it. Playboy urges that the giving of this isolated

instruction was improper since the court allowed the jury to decide whether the contract was ambiguous and that by not giving proper alternate instructions, the jury was left to speculate as to what the issues were. It maintains that it was the trial court's function to determine whether the contract was ambiguous, and that in finding so, the court then should have found it to be a question of fact as to what the contract's meaning was, and then instructed the jury among the alternatives and the result which would follow from each alternative. Jury instructions are to be viewed as a whole and reversible error occurs only when serious prejudice to a right to a fair trial has been proven. (See *Yedor v. Centre Properties, Inc.* (1988), 173 Ill. App. 3d 132, 527 N.E.2d 414.) In the present case, there was no finding of ambiguity in the contract by the trial court. Further, as Playboy has failed to demonstrate a showing of prejudice here, we find no grounds for reversal.

■ Playboy's fourth contention is that the damage award was against the manifest weight of the evidence because no damages were proximately caused by reason of a failure to comply with the provisions of the handbook. We agree that the damage award is against the manifest weight of the evidence; however, we reach our decision for a different reason than that argued by Playboy. It urges that Illinois courts should make a difference, as a matter of principle, between a discharge which is wrongful on the one hand and one in which the employer failed to follow a procedure set forth in a contract. However, since Playboy cites no authority in support of this theory, we will not search for authority, if any, to lend credence to its argument. See *Webb v. Angell* (1987), 155 Ill. App. 3d 848, 854, 508 N.E.2d 508.

■ Playboy also argues that plaintiff was improperly allowed to collect an amount in damages which included a factor for increases in compensation she would have received. We agree with this contention. The measure of damages for breach of contract is the amount which will compensate the injured party for the loss which either fulfillment of the contract would have prevented or which the breach of it has entailed. (*LeFevour v. Howorka* (1991), 224 Ill. App. 3d 428, 586 N.E.2d 656.) Lost wages are the amount normally received without discharge less the amount earned or that reasonably could have been earned in mitigation. (*Miller v. Board of Education of School District No. 132* (1968), 98 Ill. App. 2d 905, 240 N.E.2d 471.) Plaintiff argues that the loss of damages can include the loss of gradual ownership of the business, akin to a raise. However, we find no proof by plaintiff here of loss of gradual ownership of a business or business interest or of loss of raises. To the contrary, the court

allowed evidence of what plaintiff would have made had she received a raise based on the fact that she had received raises during her employment tenure. However, the evidence demonstrates that Playboy was reorganizing, cutting back, consolidating and otherwise involved in measures to lower costs. The purpose of damages is to put the nonbreaching party into the position he or she would have been in had the contract been performed, but not in a better position. Moreover, compensation awarded in a breach of contract should not provide plaintiff with a windfall. See *Feldstein v. Guinan* (1986), 148 Ill. App. 3d 610, 499 N.E.2d 535; *Golen v. Chamberlain Manufacturing Corp.* (1985), 139 Ill. App. 3d 53, 487 N.E.2d 121.

Accordingly, we find that the jury's determination of damages should be set aside as contrary to the manifest weight of the evidence and as contrary to the law. We remand this matter to the trial court to determine the amount of damages to which plaintiff is entitled. The trial court should be guided by the law in Illinois as enunciated in *Feldstein, Golen* and other cases and consider this issue in light thereof. We believe it was improper to place plaintiff in a better position, *i.e.*, by considering a possible raise, than she would have been had the contract been performed.

The final issue on appeal is whether the trial court properly reduced the jury's verdict by the amount received by plaintiff as unemployment compensation. On her cross-appeal, plaintiff contends the trial court erred in so doing. We believe that the action of the trial court in this regard should be reversed as a violation of the collateral source rule. In *Perry v. Larson* (7th Cir. 1986), 794 F.2d 279, the defendant, a sheriff, wrongfully discharged plaintiff, a deputy, in violation of his civil rights. The court refused defendant's request to reduce the jury's verdict (1) by the amount plaintiff had received as unemployment compensation, and (2) by $3,000, the amount plaintiff earned while unemployed. As to the unemployment compensation, the court held that it would be improper to reduce the jury's award by that amount, in that to do so would violate the collateral source rule. The court stated that unemployment compensation is a source of funds independent of the transaction giving rise to the claim and, thus, is collateral, citing *Salcer v. Envicon Equities Corp.* (2d Cir. 1984), 744 F.2d 935, 941-42, *Collins v. Robinson* (E.D. Ark. 1983), 568 F. Supp. 1464, 1471, and *Thomas v. Shelton* (7th Cir. 1984), 740 F.2d 478, 484. The court stated that the purpose of the collateral source rule is not to prevent the plaintiff from being overcompensated but rather to prevent the tortfeasor from paying twice, and the plaintiff could not benefit simply because the State had provided a means of helping those who are out of work, justly or unjustly. (*Perry v. Lar-*

*son,* 794 F.2d at 286.) Damages awarded in an action for the breach of an employment contract are not to be reduced by the amount of unemployment compensation benefits received by the plaintiff. *Powell v. Wyoming Cablevision, Inc.* (1991), 184 W.Va. 700, 708, 403 S.E.2d 717, 725; *Potvin v. Seven Elms, Inc.* (Me. 1993), 628 A.2d 115.

As to the $3,000 earned by plaintiff while unemployed, the *Perry* court, in refusing to reduce the award by this amount, pointed out that the defendant had the opportunity to argue mitigation evidence to the jury and to offer an instruction on mitigation, but had done neither. *Perry v. Larson,* 794 F.2d at 286.

In *Schwarze v. Solo Cup Co.* (1983), 112 Ill. App. 3d 632, 445 N.E.2d 872, a discharged employee filed suit seeking damages for alleged breach of the employment agreement. After a bench trial, the judgment was entered in favor of the employee. The appellate court held that unemployment payments received by the employee would not be offset against damages, stating that benefits payable because of unemployment are intended to relieve financial distress. (*Schwarze v. Solo Cup Co.,* 112 Ill. App. 3d at 640, 445 N.E.2d at 877.) In the instant case, as in *Schwarze,* the damages awarded to plaintiff are not to be reduced by the amount of the unemployment compensation benefits received by plaintiff.

■ In this case, although plaintiff stipulated at the hearing on defendant's post-trial motion as to the amount she received as unemployment compensation, no evidence with respect to plaintiff's unemployment compensation was presented to the jury and no instruction in this regard was tendered by defendant. Thus, under the authority of *Perry v. Larson* (794 F.2d at 286), based on these failures, even if such compensation could be used to reduce the jury's award, defendant waived its rights to claim mitigation, and it would be improper for the trial court to reduce the jury's award.

For the forgoing reasons the judgment of the trial court in finding that the handbook creates enforceable contractual rights between the plaintiff and Playboy is affirmed. There was no abuse of discretion by the trial court regarding matters allowed into evidence. The jury instructions did not result in serious prejudice of a right to a fair trial. The damage award is against the manifest weight of the evidence for the reasons stated. And, the jury's award should not be reduced by the amount plaintiff received as unemployment compensation. This cause is remanded to the trial court for appropriate action not inconsistent with this opinion.

Affirmed in part; reversed in part and remanded.

BUCKLEY and O'CONNOR, JJ., concur.