Susan **FINNANE** and James
Finnane, Plaintiffs,

v.

**PENTEL OF AMERICA, LTD.,**
an Illinois Corporation,
Defendant.

No. 98 C 5187.

United States District Court,
N.D. Illinois,
Eastern Division.

March 22, 1999.

Jennifer Ann Nielsen, Bedrava, Lyman & Van Epps, Oak Brook, IL, Steven M. Ruffalo, Donald Naylor Wilson, Jason Russell Surber, Howard Scott Dakoff, Fuchs & Roselli, Ltd, Chicago, IL, for plaintiffs.

James S. Barber, Anne Laura Loevy, Michelle K.B. Garcia, Clausen Miller P.C., Chicago, IL, for defendant.

## OPINION and ORDER

NORGLE, District Judge.

Before the court is Defendant Pentel of America, Ltd.'s ("Pentel") Motion to Dismiss and to Strike portions of Count I of Plaintiffs' Amended Complaint and to Dismiss Counts II–V. For the reasons stated below, the motion is granted in part and denied in part.

### I.

### ALLEGED FACTS [1]

In 1991, Pentel, an office supply distribution company with its principal place of business in Elk Grove Village, Illinois, hired Plaintiff Susan Finnane ("Finnane") as a consumer representative. Four years later in 1995, Pentel promoted Finnane to the position of sales representative. As part of her duties, in September 1995, Finnane was required to attend Pentel's National Sales Meeting, which Pentel held over several days at a hotel in Newport Beach, California. On one evening during the conference, Paul Ventimiglia ("Ventimiglia"), Pentel's National Sales Manager, summoned Finnane to his hotel room to discuss business. After Finnane entered, Ventimiglia asked her to sit on his bed. He then sat next to her and told her that during the previous night he envisioned her "in a black bra and underwear" and told Finnane that he had "sat masturbating thinking of [her]." (Amend.Compl., at ¶ 16.) Ventimiglia proceeded to grope Finnane during which time he exposed his penis. He then began masturbating and "requested and pleaded with [her] to have sexual intercourse with him." (Id. at ¶ 17.) "[Finnane] immediately pushed Ventimiglia away, requesting that he stop his unwelcome behavior and advances" and fled from the room. (Id. at ¶ 18.)

The following evening Finnane met with a supervisor, Tim Fallihee ("Fallihee"),

Pentel's Director of Sales. During the discussion, he informed her that he knew of the previous night's events and recommended that Finnane "keep her mouth shut." (Id. at ¶ 19.) Pentel took no steps to investigate the incident, and a month later, Ventimiglia contacted Finnane to apologize for his conduct.

In November 1995, Ventimiglia contacted Finnane again and informed her that he would be traveling to Illinois on business and that he wanted to meet with her to discuss business over dinner. Finnane agreed. After Ventimiglia's arrival, Finnane accompanied him on what he said would be a business dinner to an Italian restaurant. Ventimiglia, however, spent most of the time inquiring about Finnane's personal and family life. After dinner, Ventimiglia asked Finnane to escort him to his hotel room. She agreed to walk with him to the door. After entering an elevator in the hotel lobby, Ventimiglia forced himself upon Finnane. He groped and fondled her in the elevator and demanded that she submit to his sexual desires. That evening, Finnane submitted to "an unwelcome act of sexual intercourse." (Id. at ¶ 27.)

After this incident, Ventimiglia made repeated obscene phone calls to Finnane between November 1995 and July 1996. The repeated calls were attempts to engage in "phone sex" and would occur as often as four times per day. (Id. at ¶ 28.) During the calls, Ventimiglia would suggest, among other things, that he wanted to: engage Finnane in anal sex; watch Finnane engage in sexual relations with other women; and see and suck on her "big nipples." (Id.) Further, Ventimiglia wanted Finnane to describe the color of her underwear; and he described how he was masturbating while talking to her. (See id.) In May 1996, after Finnane rejected Ventimiglia's repeated attempts to engage in phone sex, he threatened her "with the

---

1. For purposes of this opinion, the court accepts Plaintiffs'. well-pleaded factual allegations in the complaint as true. See Gutierrez v. Peters, 111 F.3d 1364, 1368–69 (7th Cir. 1997).

loss of her job." (*Id.* at ¶ 29.) Again in June 1996, while at a trade show in Chicago, "Ventimiglia cornered [Finnane] and touched and groped her against her will, despite her insistence that he not touch her." (*Id.* at ¶ 30.)

The following month, after Finnane insisted that Ventimiglia cease his unwanted sexual advances, he cautioned her that if she disclosed his behavior she would be terminated as soon as she failed to reach her sales quota. A year later, in August 1997, Ventimiglia cornered Finnane during a national sales meeting in California and "felt and grabbed [her] buttocks." (*Id.* at ¶ 32.) When she attempted to push him away, Ventimiglia told her that if she told anyone about his conduct, she would not only lose her job, but he would also "kill her." (*Id.*)

Between the Fall of 1995 and March 1998, Finnane repeatedly informed her supervisors and other management personnel of Ventimiglia's conduct. In doing so, Finnane followed the procedures described in Pentel's Employee Handbook. However, despite her repeated complaints, Pentel did not take any action to investigate or reprimand Ventimiglia. For instance, Finnane informed her regional manager, Al Homesley ("Homesley"), of Ventimiglia's conduct and the effect it was having on her. Rather than investigate, Homesley recommended that she leave the company.

In October 1997, she was subjected to verbal ridicule by her new regional manager, Gary Poillucci ("Poillucci"), who commented in a joking manner before Finnane and her co-employees that she "[gave] Pentel a bad name." (*Id.* at ¶ 39.) Finnane, however, was among Pentel's top sales people and received achievement awards in prior years.

In December 1997, Poillucci also made unwelcome sexual advances upon Finnane and informed her that he had "envisioned doing this for the last year." (*Id.* at ¶ 40.) He also told her that he "didn't know whether [he] would rather go to dinner with [her] or take [her] to bed." (*Id.*) On January 13, 1998, Poillucci directed Finnane to meet him at a hotel room to discuss business. After she arrived, Poillucci proceeded to kiss and grope her. When she rebuffed these advances, Poillucci commented that he knew she had been the subject of Ventimiglia's advances and threats. He also stated that he often joked about the situation with Fallihee. Shortly thereafter, in May 1998, Pentel placed Finnane on a leave of absence and changed her employment status from active to inactive. As of the date this action was filed, Finnane remained on the leave of absence.

## II.

### PROCEDURAL BACKGROUND

On May 18, 1998, Finnane filed a charge of discrimination against Pentel with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a "right to sue" letter on July 24, 1998, and Finnane filed this action on August 20, 1998. Finnane's Amended Complaint, filed on January 13, 1999, contains five Counts. Count I alleges Civil Rights violations under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, *see* 42 U.S.C. § 2000e *et seq.*, based upon the conduct described above which took place between 1995 and 1998. Count II is a breach of contract claim which alleges that Pentel breached its agreement to promptly investigate reports of harassment and discipline offenders, as allegedly promised in its Employee Handbook. Count III alleges negligent supervision based upon Pentel's failure to adequately supervise Ventimiglia and Poillucci. Count IV alleges that Pentel was negligent in that it had a duty not to retain such employees. Count V is a loss of consortium action by Finnane's husband, James Finnane.

## III.

### LEGAL STANDARD

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, the court merely looks at the sufficiency of the complaint, *see Autry v. Northwest Prem. Serv., Inc.*, 144 F.3d 1037, 1039 (7th Cir.1998); the court does not decide whether the plaintiff has a winning claim. *See Herdrich v. Pegram*, 154 F.3d 362, 369 (7th Cir.1998). The court will deny the motion unless "it is impossible [for the plaintiff] to prevail 'under any set of facts that could be proved consistent with her allegations.'" *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir.1997) (*quoting Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). The court "must look to see whether there is any possible interpretation of the complaint under which it can state a claim." *Martinez v. Hooper*, 148 F.3d 856, 858 (7th Cir.1998). When reviewing the complaint, the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences therefrom in the light most favorable to the plaintiff. *See Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 502 (7th Cir.1998).

## IV.

## DISCUSSION

### A. COUNT I—CIVIL RIGHTS

Count I of Finnane's Amended Complaint alleges sexual harassment in violation of Title VII. Pentel claims that a majority of the allegations of harassment are time-barred and thus should be dismissed and stricken. The court agrees.

■■■ Sexual harassment is a recognized subset of gender discrimination. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Title VII deems unwelcome sexual advances as unlawful sex discrimination because they create an offensive or hostile working environment. *See Hartman v. Pena*, 914 F.Supp. 225, 228 (N.D.Ill.1995). " 'When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is suffi-

ciently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.' " *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, ——, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998) (*quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). With respect to harassment by a co-worker, an employer may be held responsible, but only if it knew or should have known of the conduct and did not take proper remedial action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, ——, 118 S.Ct. 2257, 2267, 141 L.Ed.2d 633 (1998) (*citing McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir.1996)).

■■■ To bring an action in federal court for sexual harassment under Title VII, a plaintiff must have filed her EEOC charge within 300 days of the occurrence of the allegedly illegal conduct. *See* 42 U.S.C. § 2000e–5(e)(1); *Hentosh v. Herman M. Finch Univ. Health Sciences*, 167 F.3d 1170, 1174 (7th Cir.1999) (*citing EEOC v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 970 (7th Cir.1996) ("Illinois is a 'deferral state,' and so the limitation period runs for 300 days from the date of the alleged discrimination.")). The 300–day limitations period "starts to run with 'the discriminatory act, not the point at which the consequences of the act become painful.'" *Lever v. Northwestern Univ.*, 979 F.2d 552, 553 (7th Cir.1992) (*quoting Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981)). With few exceptions to this rule, a plaintiff must base a Title VII action on occurrences entirely within the scope of the 300–day period. *See Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1166 (7th Cir.1996).

In this case, Finnane claims to have been harassed in incidents occurring between 1995 and 1998. Admittedly, because many of the allegations fall outside the 300–day limit, which extends only as far back as July 22, 1997, they appear time-barred. Finnane argues, however, that

she alleges a continuing violation, an exception to the 300–day rule, and thus her allegations arising outside the 300 days form a proper basis of recovery under Title VII.

The Seventh Circuit recently described the continuing violation doctrine as follows:

"The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir.1992). In *Galloway v. General Motors Parts Operations*, 78 F.3d 1164 (7th Cir.1996), we placed limitations on the circumstances in which acts of sexual harassment may be linked together to defeat the statute of limitations. Acts that fall outside the statute of limitations may be joined to an act within the statute only if a reasonable person in the position of the plaintiff would not have known, at the time the untimely acts occurred, that she had a claim; rather, she could only tell by hindsight that the untimely acts represented the early stages of harassment. *See id.* at 1166 (sexual harassment, in its early stages, "may not be diagnosable as sex discrimination, or may not cross the threshold that separates the nonactionable from the actionable . . . .").

*Garrison v. Burke*, 165 F.3d 565, 569–70 (7th Cir.1999). More recently, the court explained:

[the] doctrine is designed to "accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period, so that all discriminatory acts committed as part of the pattern or policy can be considered . . . timely." Peatzold & O'Leary, *Continuing Violations and Hostile Environment Sexual Harassment: When is Enough, Enough?*, 31 AM.BUS.L.J. 365 (1994).

When it would be unreasonable to expect the plaintiff to perceive offensive conduct as Title VII harassment before the limitations period runs, or the earlier discrimination may only be recognized as actionable in light of "events that occurred later, within the period of the statute of limitations" the continuing violation doctrine applies. *Galloway*, 78 F.3d at 1167. The doctrine also may be used when, after an initial incident of discrimination, a plaintiff does not feel "sufficient distress to . . . mak[e] a federal case." *Id.* at 1166.

On the other hand, the continuing violation doctrine has delineated limits. Where a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she "cannot reach back and base her suit on conduct that occurred outside the statute of limitations." *Id.* at 1167; *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 446 (7th Cir.1994).

*Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir.1999). *See also Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 281–82 (7th Cir.1993).

In *Garrison*, a female firefighter ("Garrison") brought a sexual harassment action against the Rockford Fire Department officials, a Rockford Fire Department lieutenant, and the City of Rockford, Illinois. Garrison alleged that during a period of four-and-a-half years (1986–1991) the lieutenant harassed her on numerous occasions and that the City and other defendants failed to protect her. The defendants moved for summary judgment on the basis that the applicable statute of limitations of two years, (*see* 735 ILCS 5/13–202), barred much of the harassing conduct, and therefore left insufficient evidence to sustain Garrison's claims. The district court agreed and awarded the defendants summary judgment.

Addressing the relevant conduct upon which a harassment charge could be based,

the district court found that a physical attack by the lieutenant in 1986, which was outside the statute of limitations, could not be linked with subsequent incidents. The Seventh Circuit agreed, concluding that the district court properly found that " 'any reasonable person in [plaintiff's] situation would have realized that [Garrison] had a substantial claim under the law once the City failed to immediately take remedial action.' Because Garrison did not require the light of subsequent events in order to discern that she had a claim," the assault could not be joined with incidents occurring within the statute of limitations. *Garrison,* 165 F.3d at 570.

In *Hardin,* the plaintiff ("Hardin") worked on a production line with a supervisor who was a "crude and boorish person, prone to offensive language and behavior." 167 F.3d at 343. Hardin alleged that during work her supervisor used expletives directed at her and others and that on numerous occasions he had touched her. These events began in 1988, and Hardin and co-employees repeatedly complained to management. By 1991, the incidents included racial overtones. However, Hardin did not file a complaint against her employer with the proper agency until 1995. Her employer asserted that Hardin was precluded from relying on any evidence that preceded the 300–day period before she filed the complaint. The Seventh Circuit agreed, concluding that "it was apparent that Hardin believed that she was a victim of harassment long before she filed her complaint...." *Id.* Thus, her racial and sexual harassment claims had to stand based on conduct within the 300–day period. *Id.* at 344; *see also Dohrer v. Metz Baking Co.,* No. 96 C 50455, 1999 WL 60140, at *6 (N.D.Ill. Jan.27, 1999); *Lewis v. Simmons Airlines, Inc.,* 16 F.Supp.2d 978, 982–83 (C.D.Ill.1998).

■ Finnane's case must suffer the same consequences. The continuing violation doctrine is inapplicable given the allegations in the Amended Complaint. During a period well before the 300–day limit,

which in this case extends to July 22, 1997, Finnane was the target of numerous egregious incidents. It began in 1995 when Ventimiglia exposed himself and expressed his desire for Finnane in no uncertain terms. That same year he forced himself upon her, ultimately leading to Finnane's submission to his sexual advances. Additionally, Ventimiglia made repeated obscene phone calls of a very graphic nature. According to Finnane, these calls ended in 1996. That year, Ventimiglia threatened Finnane with the loss of her job.

No matter how violent or reprehensible this conduct is, it is evident that the events do not fall within the 300–day period. Consequently, they may not form the basis for recovery. Finnane asserts that this finding is inappropriate at this stage of the litigation. She contends that the issue of a continuing violation is a question of fact, because determining what conduct within the period is actionable necessitates a subjective inquiry. The court disagrees and finds that there is a sufficient basis to conclude, as a matter of law, that the conduct alleged in the Amended Complaint was actionable at the time it occurred.

It is well-settled that the court need not turn a blind eye to allegations which undermine the plaintiff's claim. *See Hamilton v. O'Leary,* 976 F.2d 341, 343 (7th Cir.1992). "Litigants may plead themselves out of court by alleging facts that establish defendants' entitlement to prevail." *Bennett v. Schmidt,* 153 F.3d 516, 519 (7th Cir.1998); *see also Soo Line R.R. Co. v. St. Louis S.W. Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997) (A "plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts."). "[J]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Soo Line R.R. Co.,* 125 F.3d at 483.

It would be unreasonable to suggest that at the time of the incidents in 1995 and 1996 that Finnane was not on notice of the

severity of the harassment. Indeed, Finnane alleges that the harassment was "pervasive, obvious, [and] flagrant. . . ." (Amend.Compl. at ¶ 50.) The incidents described are of such a serious character that "any reasonable person in [Finnane's] situation would have realized that [she] had a substantial claim under the law once [Pentel] failed to immediately take remedial action." *Garrison,* 165 F.3d at 570. Accordingly, the court concludes that the matters alleged beyond the 300–day period are time-barred.

Nevertheless, Finnane asserts that the materials should not be stricken. The court disagrees. The time-barred incidents cannot form the basis of a claim and thus are properly stricken from the complaint. *See e.g. Conway v. Cook County,* No. 98 C 5324, 1999 WL 14497, at *6–7 (N.D.Ill. Jan 8, 1999). Whether any incidents are admissible at trial is an evidentiary matter to be determined later. *See e.g. id.* For these reasons, Finnane's Amended Complaint is dismissed and stricken to the extent that is seeks recovery under Title VII for time-barred events.

## B. COUNT II—BREACH OF CONTRACT

In her breach of contract action, Finnane alleges that the provisions relating to sexual harassment in Pentel's Employee Handbook created a binding agreement which Pentel breached. Specifically, Finnane relies on Pentel's harassment policy as creating an offer which she accepted by continuing to work at Pentel. Pentel's handbook includes numerous statements referring to sexual harassment. For example, it states that incidents of harassment should be reported to managers or supervisors and they in turn should immediately inform the personnel administrator. (*See* Amend.Compl., Ex. B at 32.) The policy further states that all incidents will be investigated thoroughly and in a confidential manner. *See id.* Pentel states that no retaliation is acceptable and that if harassment is established, the offender

will be disciplined. *See id.* According to Finnane, these provisions form the core of an agreement between Pentel and its employees which support a claim of breach of contract.

In *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.,* 115 Ill.2d 482, 106 Ill. Dec. 8, 505 N.E.2d 314, 318 (1987), the Illinois Supreme Court rejected the view that an employee handbook or policy statement could not create enforceable contractual rights. The court held that if the traditional aspects of contract formation are present, the handbook creates a binding agreement between employer and employee. *See id.* Under "traditional requirements for contract formation," a "handbook or other policy statement creates enforceable contractual rights" if: (1) "the language of the policy statement [includes] a promise clear enough that an employee would reasonably believe that an offer has been made," (2) "the statement [is] disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer," and (3) "the employee [accepts] the offer by commencing or continuing to work after learning of the policy statement." *Id.* at 318.

*Duldulao* focused on at-will employment relationships and how a handbook or policy could overcome the common law presumption that an employment relationship is terminable at the election of either party. 106 Ill.Dec. 8, 505 N.E.2d at 317–18. After considering case law from around the nation, the court held that employee handbooks could create binding contractual obligations and thus modify the at-will employment status. *See id.* It then established the test set out above and applied it to the policy at issue. The court concluded that, because the employee handbook created a clear and definite right to particular disciplinary procedures, in that an employee who read the handbook would reasonably believe that he could only be terminated pursuant to the described procedures, a binding contractu-

al obligation arose. *See id.* at 318–19. As all the elements were established and there were no disclaimers to negate any promises, the court found that the language in the handbook constituted an offer which could be accepted by an employee and for which their continued work constituted consideration. *See id.* Consequently, the employment relationship was no longer terminable at-will.

In this matter, the parties dispute the existence of the first element, *i.e.*, whether there was a clear promise so that Finnane could reasonably believe that an offer was made. Courts employ an objective test when determining whether a promise is clear enough so that an employee could reasonably construe it as an offer. *See St. Peters v. Shell Oil Co.*, 77 F.3d 184, 187 (7th Cir.1996). Significantly, in this case, the policy contains a disclaimer stating that the policy was not a contract and created no legal duties. Illinois courts have recognized that such disclaimers can be sufficient to defeat the clear promise requirement. *See Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir.1996). On the last page of the handbook above the signature line appears:

### ACKNOWLEDGMENT

**PLEASE READ THE EMPLOYEE HANDBOOK AND FILL OUT AND RETURN THIS PORTION TO THE PERSONNEL DEPARTMENT OF YOUR SUPERVISOR WITHIN ONE WEEK OF RECEIVING THIS HANDBOOK.**

Employee Name: Susan Finnane [Typed]
 (Please Print)

This will acknowledge that I have been given a copy of Pentel of America, Ltd.'s Employee Handbook which summarizes the Company's personnel guidelines. I also acknowledge that I have read and understood the contents of this Handbook and I am aware that Pentel maintains a comprehensive Personnel Policy Manual which contains the entire version of the policies outlined by this Handbook. I understand that the statements contained in this Handbook are not intended to create any contractual or other legal obligations and do not alter the at-will status of my employment with Pentel. I also understand that the Company may modify or rescind any policies, benefits, or practices described in the Employee Handbook or Personnel Policy Manual at any time without prior notice to me.

Date: 6–20–95 /s/

Signed: Susan J. Finnane /s/
 Employee

(Amend.Compl., Ex. B.)

Finnane argues that this inclusion is insufficient to create a proper disclaimer because it is not conspicuous. In Illinois, courts are in dispute as to whether clear language of disclaimer is enough or whether additional requirements of conspicuousness must be met. *Compare Wheeler v. Phoenix Co. of Chicago*, 276 Ill.App.3d 156, 213 Ill.Dec. 62, 658 N.E.2d 532, 535–37 (2d Dist.1995) (disclaimer language inapplicable where language was not distinguished in any manner from rest of text); *Hicks v. Methodist Medical Ctr.*, 229 Ill.App.3d 610, 170 Ill.Dec. 577, 593 N.E.2d 119, 121 (3d Dist.1992) (disclaimer ineffective because it was not "highlighted, printed in capital letters, or in any way prominently displayed."); *Long v. Tazewell/Pekin Consol. Comm. Ctr.*, 215 Ill. App.3d 134, 158 Ill.Dec. 798, 574 N.E.2d 1191, 1193–94 (3d Dist.1991) (refusing to enforce disclaimer which "was not distinctly set out separate and apart."); *Perman v. ArcVentures, Inc.*, 196 Ill.App.3d 758, 143 Ill.Dec. 910, 554 N.E.2d 982, 987 (1st Dist.1990) (finding contractual obligations despite disclaimer language) *with Robinson v. Christopher Greater Area Rural Health Planning Corp.* 207 Ill.App.3d 1030, 152 Ill.Dec. 891, 566 N.E.2d 768, 772 (5th Dist.1991) (promises negated where manual stated that employer " 'assumes no contractual liability to any employee

via the job description or this publication.' "); *Anders v. Mobil Chem. Co.*, 201 Ill.App.3d 1088, 147 Ill.Dec. 779, 559 N.E.2d 1119, 1122–23 (4th Dist.1990); (no clear promises in light of explicit disclaimer); *Bennett v. Evanston Hosp.*, 184 Ill. App.3d 1030, 133 Ill.Dec. 113, 540 N.E.2d 979, 980 (1st Dist.1989) (no contract could exist in light of explicit disclaimer in introduction).

■ Regardless, the court need not enter the fray among the courts as it finds that the disclaiming language is clear and unequivocal, and that the disclaimer in question is sufficiently conspicuous. Given its placement on the acknowledgment page above the signature line, a reasonable person in Finnane's position ought to have noticed it. *See Wheeler*, 213 Ill.Dec. 62, 658 N.E.2d at 536 (borrowing definition from Uniform Commercial Code that contract language is conspicuous if it is written so that "a reasonable person against whom it is to operate ought to have noticed it."). An enforceable contract right cannot exist in light of this clear unequivocal disclaimer. *See Border*, 75 F.3d at 273; *Doe v. First Nat. Bank of Chicago*, 865 F.2d 864, 873 (7th Cir.1989); *Hanna v. Marshall Field & Co.*, 279 Ill.App.3d 784, 216 Ill.Dec. 283, 665 N.E.2d 343, 348 (1st Dist.1996); *see also Holley v. Pansophic Sys., Inc.*, No. 90 C 7505, 1997 WL 24708, at *3 (N.D.Ill. Jan 17, 1997) (disclaimer appearing as final paragraph in a four page introduction sufficient to disclaim any purpose to contractually bind parties).

Furthermore, the court is of the opinion that the rule established in *Duldulao* does not extend to the circumstances in this case. This case is distinguishable from the general class of cases in which employee handbooks have been found to establish contractual obligations. *Duldulao*, and cases following it, generally allow for an employee's at-will employment status to be modified with handbook provisions which create contractual obligations relating to progressive discipline procedures prior to termination. *See Svigos v. Petry Televi-*

*sion, Inc.*, No. 95 C 5899, 1996 WL 388416, at *4 (N.D.Ill. July 9, 1996) (*citing Mitchell v. Jewel Food Stores*, 142 Ill.2d 152, 154 Ill.Dec. 606, 568 N.E.2d 827, 831 (1990); *Harden v. Playboy Enterprises, Inc.*, 261 Ill.App.3d 443, 198 Ill.Dec. 923, 633 N.E.2d 764 (1st Dist.1993)). Although Illinois courts have extended *Duldulao* finding that employees may assert contractual rights to receive specific tangible benefits listed in a handbook, *see id.* (*citing Dow v. Columbus–Cabrini Med. Ctr.*, 274 Ill. App.3d 653, 211 Ill.Dec. 341, 655 N.E.2d 1 (1st Dist.1995); *DeFosse v. Cherry Elec. Products Corp.*, 156 Ill.App.3d 1030, 109 Ill.Dec. 520, 510 N.E.2d 141 (2d Dist. 1987)), such cases involve rights to clearly promised property interests rather than matters related to working conditions, *see id.*

Accordingly, in *Svigos* the court rejected the plaintiff's claims that she could sue her employer for breach of contract in connection with statements in the employer's handbook that it would investigate and assess sexual harassment complaints. *See id.* The action neither affected the at-will employment relationship nor did it otherwise involve tangible benefits as identified by Illinois courts. *See id.* Furthermore, the court noted that even if a contract had been created, it could not conceive how contract damages could be established by the employer's failure to investigate. Consequently, the action was dismissed. *See id.*

In *Corluka v. Bridgford Foods of Illinois, Inc.*, 284 Ill.App.3d 190, 219 Ill.Dec. 647, 671 N.E.2d 814, 818–19 (1st Dist. 1996), the court reviewed a harassment policy similar to the one at issue here and reached a different conclusion. The court found that the defendant's memorandum was more than just a policy statement or expectation statement—it was a promise; the promise being that the defendant would end any harassment that the employee experienced. *See id.* at 818. Relying on this "offer," plaintiff in turn carried

out his contractual obligations by reporting incidents. *See id.*

The court does not find *Corluka* persuasive on this issue. While *Duldulao* and its progeny focus upon the effect a handbook or policy may have on at-will employment status, *see e.g. Border,* 75 F.3d 270 (and cases discussed therein), *Corluka* clearly takes another step. It seeks to input contractual duties which do not affect the at-will nature of employment in the least.[2] To the extent that *Corluka* holds that the policy at issue created contractual duties binding the defendant, the court declines to follow that decision.

For these reasons, the court dismisses Finnane's breach of contract action. The presence of the disclaimer negates any clear promise. And as in *Svigos,* the claim is based upon alleged contractual rights unrelated to progressive discipline or tangible benefits, and the court declines to extend *Duldulao* further. Finnane's breach of contract action (Count II) is therefore dismissed, and allegations referring to contractual duties are stricken.

## C. COUNT III—NEGLIGENT SUPERVISION & COUNT IV—NEGLIGENT RETENTION

 Pentel moves to dismiss both the negligent supervision and negligent reten-

tion[3] counts on the basis that they are preempted by the Illinois Human Rights Act ("IHRA"), *see* 775 ILCS 5/1–101 *et seq.* Additionally, Pentel moves to dismiss the claims to the extent that they are based on time-barred events.

### (1) Preemption

 The exclusivity provision of the IHRA provides that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction on the subject of an alleged civil rights violation other than set forth in [the] Act." 775 ILCS 5/8–111(C). This jurisdictional restriction includes any state claims that are "inextricably linked" to sexual harassment claims. *Geise v. Phoenix Co. of Chicago,* 159 Ill.2d 507, 203 Ill.Dec. 454, 639 N.E.2d 1273, 1277 (1994). The IHRA defines sexual harassment as:

> any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when ... such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Being a jurisdictional limitation on the state courts, the exclusivity provision is also a limitation on this court.[4] *See Thom-*

2. Further, based on the facts of that case, it is debatable whether the "contract" was supported by consideration because the handbook did not impose duties on defendant beyond those required by law. *See Willis v. Evans Products Co.,* No. 86 C 9111, 1987 WL 11337, at *5–6 (N.D.Ill. May 14, 1987); *Sample v. Aldi, Inc.,* No. 93 C 3094, 1994 WL 48780 (N.D.Ill. Feb. 15, 1994). Pentel asserts that any alleged agreement would be similarly deficient for lack of consideration in this case. The court disagrees. Because the handbook discusses matters beyond the scope of Title VII (*e.g.* prompt, confidential investigation and duty to discipline and/or terminate), consideration exists.

3. To state a cause of action for negligent supervision a plaintiff must establish that: (1) her employer had a duty to supervise its employees; (2) the employer negligently supervised an employee; and (3) the negligence

proximately caused the plaintiff's injuries. *See Van Horne v. Muller,* 294 Ill.App.3d 649, 229 Ill.Dec. 138, 691 N.E.2d 74, 79 (1st Dist.), *rev'd in part,* 185 Ill.2d 299, 235 Ill.Dec. 715, 705 N.E.2d 898 (1998). To succeed in a claim for negligent hiring or retention, a plaintiff must demonstrate that: (1) the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury. *See Van Horne v. Muller,* 185 Ill.2d 299, 235 Ill. Dec. 715, 705 N.E.2d 898, 904 (1998).

4. To the extent that Pentel seeks to dismiss Counts III and IV on the basis of preemption it is improperly labeled as a Rule 12(b)(6) Motion to Dismiss. The court considers this

as v. L'Eggs Products, Inc., 13 F.Supp.2d 806, 808 (C.D.Ill.1998); Guy v. Illinois, 958 F.Supp. 1300, 1312 (N.D.Ill.1997).

In Geise, 203 Ill.Dec. 454, 639 N.E.2d 1273, the Illinois Supreme Court addressed the scope of the IHRA's application in terms of sexual harassment claims. The plaintiff ("Geise") alleged that her employer negligently hired and retained one of its managers who sexually harassed her. Crucial to the court's analysis was that the allegations of negligence directed against the employer were premised on the facts that the employer hired and retained the individual who sexually harassed Geise. "Absent the allegations of sexual harassment, Geise would have no independent basis for imposing liability on her former employer...." Id. at 1277. The allegations were so "inextricably linked" to the allegations of sexual harassment that the court rejected Geise's attempt to couch the employer's liability in terms of negligent hiring and negligent retention. See id. Because the allegations did "not alter the fundamental nature of [the] cause of action[,]" the allegations fell within the scope of the IHRA and were thus dismissed for lack of jurisdiction. Id. at 1277–78.

Subsequently, in Maksimovic v. Tsogalis, 177 Ill.2d 511, 227 Ill.Dec. 98, 687 N.E.2d 21 (1997), the Illinois Supreme Court revisited the issue of the exclusiveness of the IHRA. Plaintiff Rada Maksimovic ("Maksimovic") filed an action in state court against her employer/manager ("Tsogalis"), alleging that he committed intentional torts of assault, battery and false imprisonment against her. Several months earlier, Maksimovic had filed a complaint with the Illinois Human Rights Commission alleging that she had been sexually harassed by Tsogalis. In the state court, she alleged that Tsogalis made various sexually threatening remarks, touched her on various points of her body including on her breast and under her skirt, and that he confined her in a walk-in cooler while he made sexual advances toward her. The circuit court dismissed the action for lack of subject-matter jurisdiction. The appellate court affirmed.

The Illinois Supreme Court identified the issue as whether "a claim of intentional tort related to allegations of sexual harassment [must] be litigated before the Illinois Human Rights Commission (the Commission), or, stated differently, does the exclusive remedy provision of the [IHRA] divest the circuit court of jurisdiction to adjudicate such common law tort claims?" Id. at 21–22. In seeking an answer, the court first sought to clarify its decision in Geise, noting that in Geise, the IHRA had "furnished the legal duty that the defendant was alleged to have breached" and that "absent the [IHRA's] prohibition of sexual harassment, the employer's hiring and retention of an employee whose conduct created a hostile work environment would not have been an actionable tort." Id. at 23. The rule extracted from Geise was therefore "not that the [IHRA] precludes the circuit court from exercising jurisdiction over all tort claims related to sexual harassment. Rather, whether the circuit court may exercise jurisdiction over a tort claim depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the act itself." Id. at 23. Applying this rule the court found that the tort claims Maksimovic alleged were not preempted as they were "merely incidental to what are otherwise ordinary common law tort claims." Id. The court reasoned that "to the extent that the plaintiff has alleged the elements of each of these torts without reference to legal duties created by the [IHRA], she has established a basis for imposing liability on the defendants independent of the IHRA." Id.

Maksimovic thus clarifies what is necessary to avoid the exclusivity provision. The focus is not solely on whether there is a core of operative facts, as many courts

portion of Pentel's motion under Rule 12(b)(1). See Fed.R.Civ.P. 12(b)(1), (6).

have concluded. *See Johnson v. C & L, Inc.,* No. 95 C 6381, 1996 WL 308282, at *5 (N.D.Ill. June 6, 1996) (citing *Geise* and noting the broad preemptive effect of the IHRA). The issue is whether there is a separate theory of redress available to the plaintiff based on duties that are not prescribed by the IHRA.

Finnane now argues that like Maksimovic, her claims of negligence are not "inextricably linked" to the allegations of sexual harassment. Instead, Finnane argues that the common law negligence "claims rely on facts alleged in her [Amended] Complaint which establish that Ventimiglia and Poillucci were unfit for their positions with [Pentel] and that [Finnane] was harmed by their acts towards her, of which [Pentel] was aware." (Pl.'s Memo. at 13.) She further states that "[w]hile an overlap of facts exists between [her] sexual harassment claim and her negligence claims, the behavior of Ventimiglia and Poillucci gives rise to the common law claims for negligent retention and negligent supervision against [Pentel] irrespective of the fact that [she] filed a Title VII [action] for sexual harassment." *Id.* at 14. Thus, Finnane argues that the sexual harassment allegations are incidental and therefore, under *Maksimovic,* she has properly stated her claims in negligence.

Again, the critical inquiry is whether Finnane can establish a basis of liability against Pentel that is independent of the IHRA. Finnane admits that there is an "overlap of facts," *id.* at 14; this overlap is so precise that the negligence allegations are difficult to unlink from the harassment allegations; they are nearly one in the same. But the Illinois Supreme Court makes clear that to the extent that tort actions are not dependent upon duties created by the IHRA, the actions are not preempted. *See Maksimovic,* 227 Ill.Dec. 98, 687 N.E.2d at 24. Here, Finnane alleges conduct for which a duty would exist beyond the IHRA.

▮ Under Illinois law prior to the IHRA, there was no duty to protect an employee against sexual harassment; that duty arose with the IHRA. *See Maksimovic,* 227 Ill.Dec. 98, 687 N.E.2d at 23. Now an employer must take action under state law to prevent employees from engaging in harassing conduct. *See Ofoma v. Armour,* No. 97 C 6420, 1998 WL 409381, at *3 (N.D.Ill. June 25, 1998). Harassment, however, may take many forms. When it is presented in a physical or physically threatening context, as occurred in this case when Ventimiglia and Poillucci sexually assaulted Finnane, and Ventimiglia threatened to "kill her," a common law negligent supervision or negligent retention claim may be based on the failure to prevent assaults and/or batteries. These allegations are not dependent upon the IHRA, but rather are otherwise based upon the statutory or common law of Illinois, and thus they survive the preemption bar. *See id.* at *4 ("[T]o the extent that plaintiff's negligent supervision claim is based on a failure to prevent assault and battery by [defendant], it is not preempted."); *see also Warnell v. Ford Motor Co.,* No. 98 C 1503, 1998 WL 748328, at *2–3 (N.D.Ill. Oct. 21, 1998) (negligent hiring and retention claims not preempted where plaintiffs alleged elements without relying on legal duties created by IHRA); *Silk v. City of Chicago,* No. 95 C 0143, 1997 WL 790598, at *16 (N.D.Ill.Dec. 17, 1997) ("[T]he court must look to the essence of the claims in order to determine whether the tort claim at issue is, in reality, a claim of discriminatory acts preemptively covered by the IHRA."); *Dikcis v. Indopco, Inc.,* No. 96 C 5526, 1997 WL 211218, at *12–13 (N.D.Ill. Apr. 18, 1997) (retaliatory discharge claim not preempted by IHRA). *But see Thomas,* 13 F.Supp.2d at 809 (negligent retention claim inextricably linked to harassment allegations). Therefore, the court denies Pentel's Motion to Dismiss Counts III and IV for lack of subject-matter jurisdiction, but dismisses the actions to the extent that they are based on duties arising from the IHRA.

### (2) Statute of Limitations

■ Additionally, the court dismisses the negligence claims insofar as they relate to incidents occurring before January 13, 1997.[5] The statute of limitations is two-years, *see* 735 ILCS 5/13–202, and Finnane cannot base her claims of negligence on incidents outside the scope of the statute. Again, Finnane cannot rely on a continuing violation theory "where the harm [was] definite and discoverable, and nothing prevented [her] from coming forward and seeking redress" at an earlier point in time. *See Zupan v. Sheahan*, No. 95 C 1302, 1996 WL 674021, at *3 (N.D.Ill. Nov. 19, 1996) (*quoting Wilson v. Giesen*, 956 F.2d 738, 743 (7th Cir.1992)); *see also Garrison*, 165 F.3d at 569–70 (discussing continuing violation doctrine and applying 735 ILCS 5/13–202). Any allegations regarding incidents prior to January 13, 1997, are time-barred and therefore stricken.

### D. COUNT V—LOSS OF CONSORTIUM

■ Finally, Pentel moves to dismiss James Finnane's loss of consortium count. " '[A] claim for loss of consortium is derivative in nature and its viability depends upon the validity of the injured spouse's claims.' " *McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1997) (*quoting Watters v. Dinn*, 666 N.E.2d 433, 438 (Ind.App.Ct.1996)). The consortium claim relies on the negligence claims. Because the negligence claims survive, albeit to a limited extent, the court denies Pentel's Motion to Dismiss the loss of consortium claim.

### V.

### CONCLUSION

For the foregoing reasons, Pentel's Motion to Strike and Dismiss is granted in part and denied in part. Count I is dismissed to the extent that it seeks recovery

based on time-barred events. Count II is dismissed in its entirety. Counts III and IV are dismissed to the extent that they rely on any duties arising from the IHRA or seek recovery based on time-barred events. As explained in part IV D, Count V survives as it relies on the negligence actions.

The court grants Finnane leave to file a second Amended Complaint within 28 days that comports with the court's opinion. The court notes that there is potential for confusion given that Count I and Counts III and IV may be based, to some extent, on the same allegations. However, because the court has ruled that these actions may only be based on events that are not time-barred and not preempted, and Count I is measured on a different time frame than Counts III and IV, Finnane shall not include a "Facts Common to All Counts" section in her complaint. This omission will avoid any confusion as to the factual basis of the respective claims.

IT IS SO ORDERED.

---

5. Although Finnane initially filed this suit on August 20, 1998, she did not include Counts III and IV until she filed her Amended Complaint on January 13, 1999.